627 A.2d 630

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. JOHN ROBERT REED, DEFENDANT–APPELLANT.

Argued September 15, 1992—Decided July 23, 1993.

238

*Mordecai Garelick*, Assistant Deputy Public Defender, argued the cause for appellant (*Zulima V. Farber*, Public Defender, attorney).

*Michael J. Williams*, Deputy Attorney General, argued the cause for respondent (*Robert J. Del Tufo*, Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

HANDLER, J.

In this case, the jury convicted defendant, John Reed, of knowing murder and aggravated criminal sexual contact. Defendant had confessed to those crimes and that confession constituted critically important evidence. The admissibility of defendant's confession presents the sole issue on this appeal. The police refused, before and during defendant's interrogation, to inform defendant that an attorney, who had been brought to police headquarters by a friend of defendant, was present and sought to confer with him. The issue is whether that refusal by the police violated defendant's constitutional rights, including the privilege against self-incrimination, and therefore rendered defendant's confession inadmissible.

I

At approximately 8:00 a.m. on March 16, 1987, the Franklin Township police received a call from Fran Varga. Varga told the police that her roommate and boyfriend, defendant, John Reed, had found the dead body of Susan Green, one of defendant's co-workers. Varga asked the police to meet her and defendant at Green's apartment.

After speaking with defendant and Varga, police entered Green's apartment. The door to the apartment was unlocked, and Green's body was found on the living room floor. She had been stabbed, and her pants and underwear had been pushed down around her knees. An assistant state medical examiner testified that the victim had been stabbed fifty-three times. Twenty-three of the wounds were potentially fatal, penetrating her abdomen, liver, lungs, and heart, and a strong blow to her head had fractured her skull.

At approximately 8:30 a.m., police informed defendant and Varga that they could leave provided they could be reached later for questioning. Shortly thereafter, Detectives Importico and Shedden, of the Franklin Township police, arrived and asked to speak to defendant.

Defendant suffers from a speech impediment due to a harelip and a cleft palate, and also tends to stutter severely when nervous. According to Varga, although she tried to help the officers understand defendant's responses to their questions, the officers ignored her. Defendant agreed to go to the prosecutor's office to give a statement and provide "elimination" fingerprints. Because defendant was still quite upset, Varga informed the police that she would drive him to the prosecutor's office.

Defendant and Varga, along with Detectives Importico and Shedden, arrived at the prosecutor's office shortly before 11:00 a.m. The detectives isolated defendant in an interrogation room, and asked Varga to remain in the waiting room. Varga testified that as soon as defendant was taken away by the police, she called her aunt who gave her the name of an attorney, Peter Lanfrit. Varga called Lanfrit shortly after 11:00 a.m., and told him that she and defendant were at the prosecutor's office, that the police were about to question defendant, and that she and defendant "needed an attorney." Lanfrit responded that he would immediately send William Aitken, an associate from Lanfrit's office. Lanfrit then instructed Aitken to meet Varga and decide whether to represent defendant, Varga, or both of them.

Varga testified that immediately after speaking to Lanfrit she informed a police officer that an attorney was on his way and asked that the police not question defendant until the attorney arrived. The officer, according to Varga, nodded that he understood.

Meanwhile, Chief Richard Thornburg met Shedden and Importico and instructed them to move defendant to the Major Crimes Building, located a few blocks away. Instead of taking defendant past the area where Varga was waiting and down the elevator, the officers led him down the stairs and out the back door of the building. At trial, the officers denied that they had intended to avoid Varga, claiming that walking down four flights of stairs with defendant had been more convenient than using the elevator near which Varga was sitting. The officers drove defendant to the

Major Crimes Building without informing Varga, arriving shortly after 11:00 a.m.

Earlier, at Green's apartment, defendant had told police that Green had called him the previous Friday, terrified because a "black man" was pounding on the window. Defendant told police that when he arrived at Green's house, no one was in sight, so he left after speaking with her for a few moments. The following day, defendant visited Green's home for a dinner date they had made for 5:00 p.m. However, no one answered the door. Unable to reach Green by telephone the remainder of the weekend, defendant maintained that he decided to drop by her home on Monday morning before work. Finding the door unlocked, he entered the townhouse, found Green's body, and called Varga.

Importico testified that he had administered *Miranda* warnings to defendant because he had been somewhat suspicious of defendant's story. Orally acknowledging that he understood his rights, defendant signed a waiver form, which was witnessed by Importico and Shedden. In the presence of Shedden, Importico, and Thornburg, defendant now gave an account somewhat different from that which he had originally supplied the police. Most significantly, defendant claimed that on Monday morning he had entered Green's home, discovered her body, covered it with a jacket and pillow, and then gone to work.

At trial, Importico testified that at the conclusion of defendant's second account, he and Thornburg had considered defendant to be "more than just a witness." At approximately 11:30 a.m., Thornburg asked defendant if he would submit to a polygraph exam, and defendant agreed to do so.

Meanwhile, at approximately 11:25 a.m., Aitken arrived at the prosecutor's office. Varga met him, explained that defendant had been taken into an office for questioning, and asked him to go help defendant with the interrogation. Aitken approached the prosecutor who would eventually present the case against defendant. Aitken told the prosecutor that he was there to represent both Varga and defendant. The prosecutor informed Aitken that de-

fendant was a witness and not a suspect, and stated that, in any event, Aitken had "no right to walk into an investigation." Aitken gave the prosecutor a business card, and the prosecutor assured Aitken that the police would call him if and when defendant requested an attorney. Aitken then took Varga to a coffee shop, where Varga told him what had happened that day.

Because the prosecutor represented the State in the case against defendant, he did not testify at the pre-trial hearing. Thus, the record does not indicate whether the prosecutor informed the investigating officers that Aitken was present. Shedden, however, testified that although he had not been aware that an attorney was present to assist defendant, he had known that one was there for Varga. No one informed defendant that a lawyer retained by Varga was waiting to see him.

Roughly about noon, Thornburg decided to administer a lie-detector test, and contacted polygraphist Lt. Mazzei. Mazzei gave defendant a *Miranda* quiz" to ensure that he understood his rights. Mazzei testified that defendant answered all of the questions appropriately and indicated that he understood that if he could not afford an attorney, one would be appointed. Defendant also signed a statement that said, "I am here of my own free will, I know I can leave this room by merely telling [Mazzei] that I wish to leave."

Before attaching defendant to the polygraph machine, Mazzei asked defendant some questions concerning his account of the murder. In response, defendant began to tell a story markedly different from the second account he had provided Thornburg, Importico, and Shedden. According to Mazzei, in the third version of the defendant's story, defendant had actually witnessed Green being murdered when, looking through Green's front window, defendant had seen a "black man" repeatedly stabbing her.

Mazzei wrote a synopsis of the story, which defendant read and signed. Mazzei then hooked defendant to a polygraph machine and demonstrated how the machine worked. Defendant decided

he did not wish to take a lie-detector test, and Mazzei unhooked him.

Mazzei left the room and informed Thornburg and Shedden that defendant had changed his story. Mazzei then returned defendant to the interrogation room, where Thornburg and Shedden told defendant that they did not believe he had been telling the truth. Employing what is known as the classic "good cop-bad cop" technique,[1] Thornburg raised his voice and accused defendant of killing Green because she would not have sex with him, and stated that defendant was "nothing more than an animal." Thornburg then left the room, claiming that he was going to file a murder complaint.

Shedden remained in the room with defendant. In a friendly tone, Shedden told defendant that although he also believed that defendant had killed Green, he could understand that defendant could have gotten upset with her for "any number of reasons," and that "he could understand how maybe [Green] could have had this coming to her." Defendant responded by admitting that he had killed Green.

After waiving his *Miranda* rights for a third time, defendant confessed on tape. Stuttering severely, defendant offered his fourth and final account of the events surrounding Green's murder. Defendant explained that Varga had gone away for the weekend even though he had asked her not to go because he was feeling "depressed and weak." After Varga left, defendant took three cans of beer and went to Green's apartment. Defendant claimed that after they talked awhile, Green became seductive and began to unbutton her pants. When defendant told her he did not

---

[1] Chief Justice Warren, in *Miranda v. Arizona,* 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966), describes this technique as "the 'friendly-unfriendly' or 'Mutt and Jeff' act" in which one police interrogator is a "relentless" investigator who "knows the subject is guilty," while the other police interrogator is "obviously a kindhearted man" who disapproves of the other interrogator's tactics but "can't hold [him] off for very long." *Id.* at 452, 86 *S.Ct.* at 1616, 16 *L.Ed.*2d at 711 (describing various contemporary interrogation techniques and quoting from extant police-interrogation manuals).

want to have sex, she called him names. According to defendant, they argued and Green brandished a knife. He asked her to put it down and to "back off." Green asked him to leave, but suddenly grabbed a "board" and came towards him with it. Defendant said that he had then "freaked out and stabbed her." Defendant could not remember where he had gotten a knife, how many times he had stabbed her (although he knew it was more than once), or whether Green had been alive when he left. He also had trouble remembering the clothes he had been wearing. The confession was taped at 3:52 p.m., almost five hours from the time defendant had been taken into custody and nearly four and one half hours from the time attorney Aitken had asked the prosecutor if he could speak with defendant.

On May 15, 1987, a grand jury indicted the defendant for first-degree murder contrary to *N.J.S.A.* 2C:11:3a(1) and (2), first-degree felony-murder contrary to *N.J.S.A.* 2C:11–3a(3), first-degree aggravated sexual assault contrary to *N.J.S.A.* 2C:14–2a, and third-degree possession of a weapon (knife) for unlawful purposes contrary to *N.J.S.A.* 2C:39–4. Defendant pled not guilty.

The matter was prosecuted as a capital case. Following defendant's conviction of knowing murder and aggravated criminal sexual contact, the jury did not impose the death penalty. The trial court sentenced defendant to life imprisonment with a thirty-year period of parole ineligibility and a $10,000 Violent Crimes Compensation Board (V.C.C.B.) penalty for the murder conviction. The court also imposed a concurrent five-year sentence with a $30 V.C.C.B. penalty for the aggravated criminal sexual contact conviction.

Prior to trial, defense counsel moved to suppress defendant's confession on the ground that defendant had not knowingly, voluntarily, and intelligently waived his *Miranda* rights. Defense counsel argued that defendant's mental limitations, separation from his friend, and the prosecutor's failure to inform defendant that his companion had obtained an attorney for him combined to cause an extremely coercive environment that had prevented

defendant from understanding the nature of his rights and the consequences of waiving them.

The trial court found that defendant was sufficiently intelligent to have comprehended his rights and, because defendant was not retarded, the police had not erred in interrogating him without his friend present. The court also found that the police had no duty to inform defendant of the attorney's presence because the attorney had never been retained to represent defendant. Further, the court concluded that even had the attorney been retained on defendant's behalf, the police had not been obliged to inform defendant of that fact. Thus the police had adequately respected defendant's rights, defendant's *Miranda* waiver had been knowing and voluntary, and his pre-indictment statements and confession were therefore admissible.

Defendant appealed his conviction and sentence. The Appellate Division determined that the verdict sheet had not allowed the jury to consider whether defendant was guilty of passion/provocation manslaughter. Accordingly, the Appellate Division reversed defendant's murder conviction and remanded the matter, 249 *N.J.Super.* 41, 592 *A.*2d 4 (1991). The court, however, rejected defendant's contention that his waiver was invalid. It found ample evidence to support the trial court's determination that defendant was not mentally retarded. Relying on federal precedent, the Appellate Division also concluded that the failure of the police to inform defendant that an attorney was seeking to speak with him had not violated defendant's right against self-incrimination. Accordingly, defendant's confession was admissible.

Defendant sought certification by this Court, asserting several grounds in support of his petition. The State filed a cross-petition based on the incorrect jury instruction on passion/provocation manslaughter. The Court denied the State's cross-petition but granted defendant's petition, limited to the issue of whether, under New Jersey law, the refusal to inform defendant of the attorney's presence had violated defendant's privilege against self-

incrimination and rendered his confession inadmissible. 127 *N.J.* 552, 606 *A.*2d 365 (1991).

## II

The Appellate Division, in rejecting defendant's contention that his confession should have been suppressed, followed the decision of the United States Supreme Court in *Moran v. Burbine,* 475 *U.S.* 412, 106 *S.Ct.* 1135, 89 *L.Ed.*2d 410 (1986). The Appellate Division stated that *Moran*

squarely held, as a matter of federal constitutional law, that the police had no obligation to advise a defendant that a third party had summoned an attorney to advise him and that, in the absence of a request by the defendant himself, an attorney's presence at the police station does not affect the right of the police to interrogate him.

In *Moran,* the defendant was in police custody for a burglary. While the defendant was in custody, the police received information connecting the defendant with a murder. The police proceeded to interrogate the defendant about the murder, even though they were aware that a public defender, retained by the defendant's sister in connection with the burglary charge, had called to say that she would act as the defendant's attorney if the police placed him in a lineup or interrogated him. Although the police assured the public defender that they had no plans to question the defendant that evening, nevertheless, shortly after the phone call, the police began interrogating the defendant about the murder. Before each interrogation session, the police informed the defendant of his *Miranda* rights and had him sign waiver forms, but they never informed him that his sister had retained a public defender to assist him or that the public defender was trying to reach him. *Id.* at 415–18, 106 *S.Ct.* at 1138–39, 89 *L.Ed.*2d at 417–18.

Writing for the majority, Justice O'Connor held that the actions of the police did not violate the defendant's fifth, sixth, or fourteenth amendment rights. After noting that the voluntariness of the waiver was not at issue, the Court found that there was no question concerning the defendant's understanding of the *Mi-*

*randa* warnings and of the consequences of waiving them. In the Court's view, the failure of the police to inform the defendant that an attorney was available to assist him was irrelevant to the question whether he had knowingly waived his rights. *Id.* at 422, 106 *S.Ct.* at 1141, 89 *L.Ed.*2d at 421.

The *Moran* decision elicited a powerful dissent from Justice Stevens, joined by Justices Brennan and Marshall. In the dissent's view, the majority was "simply wrong" in stating that the analysis is complete on establishing that a waiver had been knowing and voluntary. *Id.* at 451–52, 106 *S.Ct.* at 1157, 89 *L.Ed.*2d at 440–41. The dissent instead stressed the fact that "custodial interrogation is inherently coercive, because disinterested witnesses are seldom available to describe what actually happened, and because history has taught us that the danger of overreaching during incommunicado interrogation is so real." *Id.* at 450–51, 106 *S.Ct.* at 1156–57, 89 *L.Ed.*2d at 440. Hence, when a waiver of constitutional rights has occurred in a custodial setting, the burden of proving the validity of such a waiver of constitutional rights is "especially heavy." *Ibid.*

The majority decision in *Moran* signalled a marked departure from the fifth amendment jurisprudence that state and federal courts had established prior to *Moran.* At the time *Moran* was decided, many courts had held that when the police fail to inform a suspect that an attorney is actually available and seeking to render assistance, any subsequent waiver of the suspect's *Miranda* rights was invalid. See, *e.g., People v. Harris,* 703 *P.*2d 667, 672–73 (Colo.1985); *State v. Stephens,* 300 *N.C.* 321, 266 *S.E.*2d 588 (1980); *Weber v. State,* 457 *A.*2d 674, 686 (Del.1983); *Haliburton v. State,* 476 *So.*2d 192, 194 (Fla.1985), *cert. granted and judgment vacated,* 475 *U.S.* 1078, 106 *S.Ct.* 1452, 89 *L.Ed.*2d 711 (1986), *aff'd on remand,* 514 *So.*2d 1088 (Fla.1987), *cert. denied,* —— *U.S.* ——, 111 *S.Ct.* 2910, 115 *L.Ed.*2d 1073 (1991); *People v. Smith,* 93 *Ill.*2d 179, 66 *Ill.Dec.* 412, 414–17, 442 *N.E.*2d 1325, 1327–30 (1982), *cert. denied,* 461 *U.S.* 937, 103 *S.Ct.* 2107, 77 *L.Ed.*2d 312 (1983); *State v. Matthews,* 408 *So.*2d 1274, 1278 (La.1982); *Commonwealth v. Sherman,* 389 *Mass.* 287, 450 *N.E.*2d

566, 570 (1983); *State v. Luck*, 15 *Ohio St*.3d 150, 15 *OBR* 296, 472 *N.E.*2d 1097, 1102–03, *cert. denied*, 470 *U.S.* 1084, 105 *S.Ct.* 1845, 85 *L.Ed.*2d 144 (1985); *Lewis v. State*, 695 *P.*2d 528, 530 (Okla.Crim.App.1985); *State v. Haynes*, 288 *Or.* 59, 602 *P.*2d 272 (1979), *cert. denied*, 446 *U.S.* 945, 100 *S.Ct.* 2175, 64 *L.Ed.*2d 802 (1980); *Commonwealth v. Hilliard*, 471 *Pa.* 318, 370 *A.*2d 322, 323 (1977); *State v. Hickman*, 175 *W.Va.* 709, 338 *S.E.*2d 188, 194–95 (1985).

Those decisions likely prompted the Supreme Court in *Moran* to state explicitly: "Nothing we say today disables the States from adopting different requirements for the conduct of their employees and officials as a matter of State law." 475 *U.S.* at 428, 106 *S.Ct.* at 1144, 89 *L.Ed.*2d at 425. As a result, since 1986, several state courts have had occasion to consider or reconsider the issue presented in *Moran*. Some of those courts, persuaded by past precedent and the dissent of Justice Stevens, have expressly rejected *Moran* on the grounds that its holding offends state-constitutional provisions protecting the privilege against self-incrimination and due process rights. See, *e.g.*, *People v. Houston*, 42 *Cal.*3d 595, 230 *Cal.Rptr.* 141, 724 *P.*2d 1166 (1986), (*overruled by constitutional amendment*, see *People v. Ledesma*, 204 *Cal. App.*3d 682, 251 *Cal.Rptr.* 417, 420–22 (1988)); *State v. Stoddard*, 206 *Conn.* 157, 537 *A.*2d 446 (1988); *Bryan v. State*, 571 *A.*2d 170 (Del.1990) (expressly reaffirming *Weber*); *Roeder v. State*, 768 *S.W.*2d 745 (Tex.Ct.App.1988); *State v. Isom*, 306 *Or.* 587, 761 *P.*2d 524 (1988) (impliedly reaffirming *Haynes, supra* ); *Haliburton v. State, supra*, 514 *So.*2d 1088. *See* Note, *Moran v. Burbine: Supreme Court Tolerates Police Interference with the Attorney–Client Relationship*, 18 *Loy.U.Chi.L.J.* 251 (1986); Casenote, *Criminal Procedure*, 17 *Seton Hall L.Rev.* 402 (1987).

Defendant's case now compels this Court to look to its own State law to determine the standards that should govern the conduct of law-enforcement officers in undertaking the custodial interrogation of a suspect and, specifically, to determine whether law-enforcement officers in conducting such interrogation must

inform the suspect that an attorney retained on his or her behalf is present and seeks to provide assistance.

### III

#### A.

In New Jersey, the right against self-incrimination is founded on a common-law and statutory—rather than a constitutional—basis. *State v. Hartley*, 103 *N.J.* 252, 260, 511 *A.*2d 80 (1986). From its beginnings as a State, New Jersey has recognized the right against self-incrimination and has consistently and vigorously protected that right. *State v. Fary*, 19 *N.J.* 431, 435, 117 *A.*2d 499 (1955); *State v. Zdanowicz*, 69 *N.J.L.* 619, 622, 55 *A.* 743 (E. & A.1903) (observing that "[a]lthough [New Jersey] ha[s] not deemed it necessary to insert in [its] constitution this prohibitive provision (the right against self-incrimination), the common law, unaltered by legislation or lax practice, is by us deemed to have its full force"). The right against self-incrimination is an integral and essential safeguard in the administration of criminal justice. The common-law right against self-incrimination was first codified in New Jersey in 1855. *L.* 1855, *c.* 236, § 4. Subsequently, the Legislature incorporated the right against self-incrimination in its enactment of the Rules of Evidence. *N.J.S.A.* 2A:84A–19; *Evid.R.* 24 and 25. Thus, although lacking a constitutional provision expressly establishing the right, "[t]he privilege against self-incrimination has been an integral thread in the fabric of New Jersey common law." *Hartley, supra,* 103 *N.J.* at 286, 511 *A.*2d 80 (quoting *Fary, supra,* 19 *N.J.* at 435, 117 *A.*2d 499).

At its core, the privilege against self-incrimination means that "[i]n New Jersey, no person can be compelled to be a witness against himself." *Zdanowicz, supra,* 69 *N.J.L.* at 622, 55 *A.* 743. A suspect has an absolute right to remain silent while under police interrogation, and at trial the State may draw no negative inference from that silence. *State v. Ripa*, 45 *N.J.* 199, 204, 212 *A.*2d 22 (1965). Waiver of that right must be knowing, intelligent, and

voluntary. *Hartley, supra,* 103 *N.J.* at 260, 511 *A.*2d 80 (citing *Miranda, supra,* 384 *U.S.* at 463–66, 86 *S.Ct.* at 1622–24, 16 *L.Ed.*2d at 717–19). In demonstrating that a defendant has waived his or her right against self-incrimination the government bears the burden of proof and that burden is a heavy one. *Ibid.*

Like the right embodied in the Fifth Amendment to the federal Constitution, the state privilege against self-incrimination is not self-implementing. Although "the Constitution does not require any specific code of procedures for protecting the privilege against self-incrimination during custodial interrogation," *Miranda, supra,* 384 *U.S.* at 490, 86 *S.Ct.* at 1636, 16 *L.Ed.*2d at 732, the United States Supreme Court and this Court have developed mechanisms for safeguarding that right. Foremost among those mechanisms are the so-called *"Miranda"* warnings. *Id.* at 479, 86 *S.Ct.* at 1630, 16 *L.Ed.*2d at 726; *Hartley, supra,* 103 *N.J.* 252, 511 *A.*2d 80. The *Miranda* warnings inform a suspect not only of the basic right against self-incrimination, but of other rights designed to effectuate that basic right. *See Moran, supra,* 475 *U.S.* at 451–52, 106 *S.Ct.* at 1156–57, 89 *L.Ed.*2d at 440–41 (Stevens, J., dissenting) (citing *Miranda* and *Edwards v. Arizona,* 451 *U.S.* 477, 101 *S.Ct.* 1880, 68 *L.Ed.*2d 378 (1981)). The privilege, then, consists of a core right that is both preserved and defined by ancillary rights. *See Hartley, supra,* 103 *N.J.* at 290, 511 *A.*2d 80 (Handler, J., concurring in part and dissenting in part). The privilege may be conceived as a "cluster of rights" that collectively give substance to the right of a person not to incriminate himself or herself under custodial police interrogation. *See* Laurence A. Benner, *Requiem for Miranda: The Rehnquist Court's Voluntariness Doctrine in Historical Perspective,* 67 *Wash.L.Rev.* 59, 84 (1989).

In effectuating the privilege against self-incrimination, this Court has recognized that ancillary rights, regardless of their legal characterization and derivation, are essential to preserving the privilege against self-incrimination. *Hartley, supra,* 103 *N.J.* 252, 511 *A.*2d 80; *id.* at 290, 511 *A.*2d 80 (Handler, J., concurring). This Court has found those ancillary rights may be given even greater protection under our State law than that accorded the

federal right. We have done so, for example, with respect to the right to remain silent, *State v. Harvey,* 121 *N.J.* 407, 581 *A.*2d 483 (1990); *State v. Bey,* 112 *N.J.* 123, 548 *A.*2d 887 (1988); *Hartley, supra,* 103 *N.J.* 252, 511 *A.*2d 80; *Ripa, supra,* 45 *N.J.* at 204, 212 *A.*2d 22; the use of pre-arrest silence, *see State v. Brown,* 118 *N.J.* 595, 573 *A.*2d 886 (1990); the use of post-arrest silence, *State v. Deatore,* 70 *N.J.* 100, 116, 358 *A.*2d 163 (1976); *Ripa, supra,* 45 *N.J.* at 204, 212 *A.*2d 22; the information that must be given with respect to the consequences of incriminating statements, *State v. Adams,* 127 *N.J.* 438, 605 *A.*2d 1097 (1992); the right to terminate interrogation, *Bey, supra,* 112 *N.J.* at 136, 548 *A.*2d 887; *State v. Kennedy,* 97 *N.J.* 278, 288, 478 *A.*2d 723 (1984); and the right to counsel, *ibid.* The Court has thus "actively embraced the opportunity to move beyond the guidelines of federal directives in pursuit of an unyielding commitment to ensure the proper admissibility of confessions." *Hartley, supra,* 103 *N.J.* at 301, 511 *A.*2d 80 (Handler, J., concurring in part and dissenting in part); *see State v. Strong,* 110 *N.J.* 583, 595, 542 *A.*2d 866 (1988).

The right to counsel has been the object of special judicial solicitude. The importance of that right was explained by Justice Pollock last term in the context of post-indictment police custodial interrogation. Although acknowledging that in the post-indictment context the right to counsel is the right to actual representation separately guaranteed by the Sixth Amendment, the Court noted the correlation between the assistance of counsel and the exercise of the privilege against self-incrimination, stating that the right to counsel during police interrogation is "a preventive measure that protects an accused from self-incrimination during police questioning." *State v. Sanchez,* 129 *N.J.* 261, 266, 609 *A.*2d 400 (1992) (citing *Miranda* ). However, equally relevant to the pre-indictment stage of a prosecution is the observation that the "essential purpose" of the right to counsel in the context of custodial interrogation "is to prevent compelled self-incrimination." *Ibid.*

The significance of the right to counsel as an adjunct of the privilege against self-incrimination is evidenced by the special requirements that are affixed to that right. It is not sufficient to advise a suspect subjected to custodial interrogation only that he or she has a generalized right to an attorney. It is essential to inform the suspect that, if the suspect cannot afford one, an attorney will be provided at State expense. *Kennedy, supra,* 97 *N.J.* 278, 478 *A.*2d 723; *Miranda, supra,* 384 *U.S.* at 473, 86 *S.Ct.* at 1627, 16 *L.Ed.*2d at 723. It is also essential that the suspect be clearly informed that he or she may ask for counsel at any time during custodial interrogation, and, additionally, that interrogation will be stopped any time the defendant desires counsel. *Kennedy, supra,* 97 *N.J.* at 288, 478 *A.*2d 723. Further, a suspect need not be articulate, clear, or explicit in requesting counsel; any indication of a desire for counsel, however ambiguous, will trigger entitlement to counsel. *Bey, supra,* 112 *N.J.* at 142, 548 *A.*2d 887; *see State v. Wright,* 97 *N.J.* 113, 477 *A.*2d 1265 (1984).

Our decisional law on the state right against self-incrimination is based on the understanding that the privilege is defined by the ancillary rights, like the right to counsel during custodial interrogation. Moreover, the protections afforded by those ancillary rights provide a metric by which to measure the strength of the privilege. The history of our case law reflects a strong commitment to enhance those ancillary rights to forestall the possible use of coerced confessions. Our own jurisprudence and legal traditions, in light of the distinctive origin and development of the privilege against self-incrimination in New Jersey, *State v. Williams,* 93 *N.J.* 39, 57, 459 *A.*2d 641 (1983), impel us to maximize the protections of the ancillary rights, including especially the right to counsel, to vindicate fully the privilege against self-incrimination.

## B.

Many state courts, as already noted, have interpreted their respective state constitutions to require that a suspect exposed to

custodial interrogation be apprised of the presence of an attorney seeking to render assistance. See *e.g., Stoddard, supra,* 537 *A.*2d at 446; *Bryan, supra,* 571 *A.*2d 170; *Isom, supra,* 761 *P.*2d at 524; *Haliburton, supra,* 514 *So.*2d 1088. Courts have offered different rationales for imposing that duty. Some have based the duty on the fundamental constraints that govern the waiver of the right against self-incrimination. Those constraints are invariably expressed in terms of whether the waiver is "knowing, intelligent, and voluntary." Thus, the Oregon Supreme Court, which reaffirmed in *Isom* the reasoning of its pre-*Moran* decision in *Haynes, supra,* 602 *P.*2d at 272, held that without the knowledge that an attorney was waiting to offer assistance, a suspect held in custody could not make a knowing and intelligent waiver of his ancillary right to counsel during interrogation.[2]

Other courts have derived the duty from notions of due process that insist on reasonable police conduct. The Delaware Supreme Court, for example, in *Bryan*, premised a valid waiver on the requirement that a suspect held in custody be apprised of the presence of an attorney, but focused on the nature of the police conduct in the custodial setting, rather than the subjective mental state of the suspect, in order not "to condone" excessive police conduct. 571 *A.*2d at 176. Similarly, the Florida Supreme Court in *Haliburton*, 514 *So.*2d 1088, held that police failure to inform

---

[2] At least one commentator has argued that in order for a suspect's confession to be valid, the suspect should be provided with "as complete an understanding of his tactical position as possible." *See* George E. Dix, *Mistake, Ignorance, Expectation of Benefit and the Modern Law of Confessions,* 1975 *Wash.U.L.Q.* 275, 330–31. On this view, deprivation of "crucial information" can convert what otherwise would be a noncoercive situation into a coercive situation. *See* George C. Thomas III, *A Philosophical Account of Coerced Self–Incrimination,* 5 *Yale Journal of Law & the Humanities* 79, 89 (1993) (citing Dix, *supra*).

The difficulty with this position is that it is unacceptably overinclusive: it would encompass information such as the death of a critical witness, the successful escape of an accomplice, and the destruction of crucial evidence. Certainly, each of these bits of information would play an important part in the suspect's understanding of his or her "tactical position" and, accordingly, in the suspect's decision to confess.

the defendant that an attorney was in the stationhouse asking to see him violated the due process provision of Florida's Constitution. The Connecticut Supreme Court in *Stoddard, supra,* noted that informing a suspect of an attorney's presence was important to the suspect's making a knowing waiver of the right against self-incrimination, 537 *A.2d* at 452–53, but based its holding primarily upon its own "due process tradition." *Id.* at 446.

The dissent here throws its lot in with those courts that believe that the essential criterion for determining the validity of a suspect's waiver, in the context of this case, is "knowledge," but concludes that the failure to inform a suspect, who has been given full *Miranda* warnings, of the presence of an attorney does not impugn or diminish the suspect's knowledge of the *Miranda* rights. *Post* at 278–279, 627 *A.2d* at 651–652. The dissent thus endorses the Supreme Court's observation in *Moran,* "Events occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right." *Moran, supra,* 475 *U.S.* at 422, 106 *S.Ct.* at 1141, 89 *L.Ed.*2d at 421.

The concurrence, in contrast, would ground the invalidation of defendant's confession entirely on the rationale that "[w]ithout being informed of the attorney's presence and availability, the suspect's waiver of the privilege ordinarily could not satisfy the requirement that a waiver be knowingly and intelligently exercised." *Post* at 270, 627 *A.2d* at 647.

However, we need not engage in an extended debate over the different approaches to dealing with the standards governing the validity of a waiver in this context. For while courts may differ on the rationale for imposing the duty to inform a suspect that an attorney is waiting to confer, they agree on one supervening principle: the atmosphere of custodial interrogation is inherently coercive and protecting the right against self-incrimination entails counteracting that coercion. Thus, although "knowledge" is always a relevant factor in assessing the validity of a waiver of the

right against self-incrimination, because the right is against *compelled* self-incrimination, "knowledge" can be best understood as a condition of "voluntariness," which itself denotes the absence of "compulsion." Consequently, standards ostensibly imposed to enhance a suspect's "knowledge" of the *Miranda* rights also counteract coercion and assure "voluntariness." Some courts have recognized that connection. In *Haynes,* for example, in concluding that a suspect who has been deprived of the knowledge that an attorney was present and ready to confer with him could not make a fully "knowing" decision to waive his right against self-incrimination, or the ancillary right to counsel during custodial interrogation, the court pointedly observed that that right is meant "to forestall involuntary and incriminating disclosures." 602 *P.*2d at 278. Similarly, in *Bryan,* the court in holding that "to knowingly, voluntarily, and intelligently waive" the ancillary right to counsel, the defendant had to be informed of his attorney's efforts to render assistance, explained that "[t]o hold otherwise would be to condone 'affirmative police interference in a communication between an attorney and suspect.'" 571 *A.*2d at 176 (quoting *Moran, supra,* 475 *U.S.* at 456, n. 42, 106 *S.Ct.* at 1159, n. 42, 89 *L.Ed.*2d at 443, n. 42 (Stevens, J., dissenting)).

The lesson to be drawn from this debate is that a waiver of the right against self-incrimination which, by all subjective indicia, appears knowing, intelligent, and voluntary, may still be deemed invalid when elicited in an atmosphere of coercion. That is because the determination of the subjective mental state that leads to a waiver is often so problematic. As *Miranda* itself observed, "Assessments of the knowledge the defendant possessed, based on information as to his age, education, intelligence, prior contact with authorities, can never be more than speculation; a warning is a clearcut fact," 384 *U.S.* at 468–69, 86 *S.Ct.* at 1625, 16 *L.Ed.*2d at 720. That observation also applies to voluntariness and coercion. Professor Thomas has pointed out that people differ widely in their ability to resist pressure, withstand pain, exhibit courage, and persevere in their convictions. Hence threats that are adequate to overcome the will of one suspect may have

little effect on another suspect. See George Thomas III, *Justice O'Connor's Pragmatic View of Coerced Self–Incrimination*, 13 *Women's Rights L.Rep.* 117 (1991). Accordingly, the most practical means to overcome coercion will be through normative rules that apply reasonable, specific, and objective standards. Although we cannot conclude with confidence that a suspect's knowledge that an attorney is ready, able, and willing to represent him or her will enhance the suspect's knowledge of the right to counsel, that knowledge will surely play an important role in "dissipat[ing] the compulsion inherent in custodial interrogation and, in so doing, guard against abridgment of the suspect's" right against self-incrimination. *Moran, supra*, 475 *U.S.* at 425, 106 *S.Ct.* at 1143, 89 *L.Ed.*2d at 423.

In contrast to the dissent, *post* at 280, 627 *A*.2d at 652, we believe that requiring the police to inform the suspect of an attorney's presence will greatly reduce the temptation, on law enforcement authorities, to pressure the suspect into a confession before the attorney gains access to the suspect. The dissent seems to assume that police will regard every suspect taken into custody as having a lawyer "on the way." Accordingly, the police, in a rush to secure a self-incriminating statement before the hypothetical lawyer arrives at the station house, will intensify their pressure to extract a confession. The dissent thus concludes that police officers, perceiving a more "limited window of opportunity" in which to question the suspect, will "cut corners in the effort to extract an incriminating statement." *Post* at 280, 627 *A*.2d at 652. Because we find the basic premise of the dissent implausible, we reject its conclusion.

The only "window of opportunity" now open for the incentive to extract an involuntary confession is the one evidenced by defendant's case: that period of time between police becoming aware of an attorney present and seeking to speak with the suspect, and the moment when a confession is finally extracted. As defendant's case well illustrates, by allowing police to withhold the information that an attorney is available to see the suspect, enormous pressure is created, on the police, to secure a confession before either the

suspect exercises the right to an attorney, or a break in the interrogation presents the opportunity for the suspect to contact family or friends who will surely tell the suspect of the attorney's presence. We are convinced that our decision today closes and locks that window.

In rejecting the exclusive focus, of both the concurrence and the dissent, on the subjective knowledge of defendant, we are simply acknowledging that the ancillary rights, after all, are not designed merely to impart subjective knowledge. The central idea that inheres in the concept of a voluntary waiver is "freedom from coercion." That realization led to our judgment in *Hartley, supra,* 103 *N.J.* at 262–63, 511 *A.*2d 80, and is at the very heart of the jurisprudence of *Miranda.* The *Miranda* decision itself clearly states:

> We have concluded that without proper safeguards the process of incustody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely. *In order to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights* and the exercise of those rights must be fully honored.
>
> [384 *U.S.* at 467, 86 *S.Ct.* at 1624, 16 *L.Ed.*2d at 719 (emphasis added).]

The ancillary rights of *Miranda* establish objective standards and although the strict application of those standards will sometimes prove overinclusive, Thomas, *supra,* 13 *Women's Rts.Rep.* at 123, they constitute an indispensable counterweight to the inherently coercive nature of custodial interrogation.[3]

---

[3] Though indispensable to reducing the coercion inherent in custodial interrogation, there is nothing, in principle, about the *Miranda* warnings to assure that they are adequate to dispel that coercion completely. Indeed, some commentators have suggested that the *Miranda* warnings are inadequate. *See Thomas, supra,* 5 *Yale J. of L. & Hum.* at 101–02. Though we engage in no argument with the *Miranda* warnings here, we note that those warnings were not based on any empirical studies of the psychology of suspects held in custody. Rather, the *Miranda* warnings represented the best estimation of the United States Supreme Court on what would be necessary to overcome the inherently coercive atmosphere of custodial interrogation and establish a rebuttal presumption of voluntariness on the part of the suspect who confessed. There is nothing in the

Consistent with the grounds of *Miranda*, we have stressed, as a matter of state law, that the salutary function of the ancillary rights defining the privilege against self-incrimination is to constrain official conduct. That understanding is illustrated by our decision in *Hartley, supra,* 103 *N.J.* 252, 511 *A.*2d 80. There, the Court went beyond federal precedent in establishing a strict rule requiring that a suspect who has exercised the right to remain silent be given fresh *Miranda* warnings before the resumption of interrogation in order fully and scrupulously to honor the "right to remain silent." 103 *N.J.* at 261, 511 *A.*2d 80. The Court recognized fresh *Miranda* warnings as a necessary prescriptive measure to protect against "the inherently compelling pressures" of custodial interrogation. *Ibid.* at 267, 511 *A.*2d 80. In *Hartley,* federal agents, who induced the defendant's incriminating statements, knew that they were coming "perilously close to violating the federal speedy-arraignment requirement" and such a violation would have led either to a dismissal or the likely suppression of any statement obtained from the defendant. *Id.* at 269, n. 3, 511 *A.*2d 80. Under such circumstances, the incentive to apply pressure on a suspect to make a confession is understandably immense. The rationale of *Hartley* is compelling in the circumstances of this case, in which an attorney retained for defendant was literally knocking at the door and seeking access to the defendant while the police were trying to get him to confess.

It is true that in *Hartley* the defendant had already asserted his right to remain silent while, in this case, defendant had not. The requirement that a confession be voluntary in order to be admissible is completely independent of and unaffected by the fact that the defendant has or has not previously asserted the right against self-incrimination or its attendant right to counsel. Accordingly, the need to overcome the coercion inherent in custodial interrogation, which may be significantly increased when a lawyer for the

*Miranda* warnings, *per se,* to suggest that the demands of a state constitution might not impose additional requirements to dispel the atmosphere of coercion even further.

suspect *is knocking at the jailhouse door,* is no less imperative in those situations in which the suspect has not yet exercised the right to remain silent or the ancillary right to counsel. Indeed, if suspects held in custody are to have a meaningful opportunity for an *initial* exercise of the ancillary right to counsel, it is essential that every reasonable effort be made to overcome the inherent coercive pressures of custodial interrogation.

Justice Brennan while still a member of this Court observed: "The privilege ... against being compelled to incriminate himself, of ancient origin, is precious to free men as a restraint against high-handed and arrogant inquisitorial practices." *Fary, supra,* 19 *N.J.* at 434, 117 *A.*2d 499 (citations omitted). We are convinced that by strictly enforcing these ancillary rights that define the privilege against self-incrimination, we can provide "ascertainable assurances" that the right has been adequately respected.

## IV

Like the rule announced in *Hartley,* our decision today should be governed by a two-fold purpose: to enhance the reliability of confessions by reducing the inherent coercion of custodial interrogation and diminish the likelihood of unreasonable police conduct in those situations where police, knowing that an attorney has been retained for the suspect and is asking for contact with his or her client, are desperate to acquire a confession before the suspect speaks with the attorney.

The State nevertheless contends that the police had no duty to inform defendant about Aitken's presence because Aitken could *not be considered defendant's attorney.* The State stresses that defendant never requested an attorney and that Aitken had no legal authority to invoke defendant's rights, and could not exercise, for defendant, the right to counsel. The State thus claims that because no attorney-client relationship existed between defendant and Aitken, law-enforcement authorities could not possibly have interfered in that relationship and defendant's right to counsel.

In most cases in which courts have held that the police had a duty, in the absence of a request by the suspect, to inform the suspect of the presence or availability of an attorney during police interrogation, that attorney had been contacted by a member of the suspect's family or a close friend, or had represented the suspect on previous charges and had voluntarily appeared at the police station, see *e.g., Stoddard, supra,* 537 *A.*2d 446; *Haliburton, supra,* 476 *So.*2d at 192, *cert. granted and judgment vacated,* 475 *U.S.* 1078, 106 *S.Ct.* 1452, 89 *L.Ed.*2d 711, *aff'd on remand,* 514 *So.*2d 1088 (Fla.1987); *Luck, supra,* 472 *N.E.*2d 1097; or the attorney had the apparent authority to represent the suspect, *e.g., Weber, supra,* 457 *A.*2d at 686; *Haynes, supra,* 602 *P.*2d at 277. However, other courts have held that the police have no duty to inform the suspect of an attorney's presence if the attorney was unknown to the suspect or was truly a volunteer who had not been retained by anyone on behalf of the suspect. *E.g., Harvey v. State,* 529 *So.*2d 1083, 1085 (Fla.1988), *cert. denied,* 489 *U.S.* 1040, 109 *S.Ct.* 1175, 103 *L.Ed.*2d 237 (1989); *State v. Chase,* 55 *Ohio St.*2d 237, 9 *O.O.*3d 180, 378 *N.E.*2d 1064 (1978).

The State insists that the ancillary right to counsel cannot be exercised unless the suspect personally requests an attorney. The state contends that "neither an attorney nor a third party may exercise a suspect's personal rights to counsel or to remain silent without any request for counsel by the suspect." We disagree. A suspect, held in custody, who "has been provided with full access to counsel" may decline to make use of counsel during interrogation. *Kennedy, supra,* 97 *N.J.* at 288, 289, 478 *A.*2d 723. An attorney-client relationship between a suspect held in custody and an attorney, however, need not depend on a specific request by the suspect for representation by that attorney.

▪ We are satisfied that an attorney-client relationship should be deemed to exist under such circumstances between the suspect and an attorney when the suspect's family or friends have retained the attorney or where the attorney has represented or is representing the suspect on another matter. When, to the knowledge

of the police, such an attorney is present or available, and the attorney has communicated a desire to confer with the suspect, the police must make that information known to the suspect before custodial interrogation can proceed or continue. Further, we hold that the failure of the police to give the suspect that information renders the suspect's subsequent waiver of the privilege against self-incrimination invalid *per se.*

Our holding is essential to give effect to the right to counsel that, in turn, effectuates the privilege against self-incrimination. Moreover, our holding is supported in large measure by the special and essential role lawyers play in realizing the purpose of the right against self-incrimination. *See Sanchez, supra,* 129 *N.J.* at 266, 609 *A.*2d 400 (observing that an attorney was essential to effectuate privilege against self-incrimination in post-indictment custodial interrogation). As Justice Blackmun observed for the Supreme Court in *Fare v. Michael C.,* 442 *U.S.* 707, 99 *S.Ct.* 2560, 61 *L.Ed.*2d 197 (1979):

> The rule in *Miranda,* however, was based on this Court's perception that the lawyer occupies a critical position in our legal system because of his unique ability to protect the Fifth Amendment rights of a client undergoing custodial interrogation.

>      \*      \*      \*      \*      \*      \*      \*      \*

> Whether it is a minor or an adult who stands accused, the lawyer is the one person to whom society as a whole looks as the protector of the legal rights of that person in his dealings with the police and the courts.
> [*Id.* at 719, 99 *S.Ct.* at 2568–69, 61 *L.Ed.*2d at 208–09].

Our holding is also consistent with the Rules of Professional Conduct of the American legal profession. The American Bar Association's Standards for Criminal Justice are unequivocally clear about the need for the earliest possible provision of counsel for an accused in custody. Standards 5–5.1; 5–7.1; *see Moran, supra,* 475 *U.S.* at 439–44, 106 *S.Ct.* at 1151–53, 89 *L.Ed.*2d at 433–35 (Stevens, J., dissenting) (noting that prosecutor's failure to inform a suspect that an attorney was available to see him violated the American Bar Association's Standards for Criminal Justice). We may note that the traditions of this State "presuppose access to counsel or family by persons in police custody." *State v.*

*Leavitt,* 107 *N.J.* 534, 541, 527 *A.*2d 403 (1987). In *Leavitt,* we noted that the *Model Code of Pre-Arraignment Procedure* of the American Law Institute, recommends that "[c]ounsel for an arrested person shall have prompt access to him, by telephone, and in person on counsel's arrival at any place where such person is detained." 107 *N.J.* at 541, 527 *A.*2d 403 (citations omitted).

We do not, however, ground our decision on the right to counsel contained in the Sixth Amendment to the federal constitution. In *Moran,* the United States Supreme Court, noting that the Sixth Amendment right to counsel did not attach before the initiation of adversary judicial proceedings, found that because the defendant had not been formally charged, the actions of the police had not violated his right to counsel. *Id.,* 475 *U.S.* at 428–30, 106 *S.Ct.* at 1144–46, 89 *L.Ed.*2d at 425–27.

Nor do we base our holding on the state constitutional right to counsel. *N.J. Const., art.* 1, § 10. In this regard we note that under New York law, a suspect's right to counsel attaches "once the police know or have been apprised of the fact that the defendant is represented by counsel or that an attorney has communicated with the police for the purpose of representing the defendant * * * and this right is not dependent upon the existence of a formal retainer" or whether a third party has contacted an attorney on the suspect's behalf. *People v. Arthur,* 22 *N.Y.*2d 325, 292 *N.Y.S.*2d 663, 239 *N.E.*2d 537, 538–39 (1968); *accord People v. Pinzon,* 44 *N.Y.*2d 458, 406 N.Y.S.2d 268, 377 *N.E.*2d 721, 724 (1978). Under the law of our State, although the right to counsel is implicated in the exercise of the privilege against self-incrimination in the pre-indictment stage of a criminal prosecution, it is not the right to counsel that is constitutionally guaranteed once a defendant has been indicted. *See Sanchez, supra,* 129 *N.J.* at 276–77, 609 *A.*2d 400.

Although we have, today, undoubtedly made explicit an additional responsibility of the State in its conduct toward criminal defendants, we do not believe that burden to be a heavy one. The duty to inform, that we place upon the State, is narrow and

specific. It arises only where counsel has made known that he or she has been retained to represent the person held in custody, is present or readily available, and makes a request to consult with the suspect in "a reasonably diligent, timely and pertinent" fashion. *Stoddard, supra,* 537 *A.*2d at 454. We do not make incumbent upon the attorney the duty to communicate directly the interrogating officers. That communication will not, most times, be possible. Rather, whenever the attorney has communicated his presence and desire to confer with the suspect to an agent of the State in a position to contact the interrogating officers, we will impute to those officers knowledge of the attorney's presence and desire to confer with the suspect. Thus, the police need do no more than receive and convey what has already been communicated: that an identified attorney retained for a person in custody is available to assist that person if he or she requests such assistance.

The standard that we adopt today declares certain police acts or omissions to invalidate a suspect's waiver of the privilege against self-incrimination. As the court held in *Haynes, supra,* the defendant's waiver of his *Miranda* rights without being advised of the availability of counsel was invalid: "When the opportunity to consult counsel is in fact frustrated, there is no room for speculation about what defendant might or might not have chosen to do after he had that opportunity." 602 *P.*2d at 280. *See Weber, supra,* 457 *A.*2d at 674; *Sherman, supra,* 450 *N.E.*2d at 570; *Commonwealth v. McKenna,* 355 *Mass.* 313, 244 *N.E.*2d 560 (1969); *Lewis, supra,* 695 *P.*2d at 530; *Hilliard, supra,* 370 *A.*2d at 323; *Hickman, supra,* 338 *S.E.*2d at 194–95. The reasoning that we expressed in *Hartley* for the adoption of a bright-line rule for the violation of the ancillary right to remain silent applies with equal force to this situation involving the ancillary right to counsel. 103 *N.J.* at 261–63, 511 *A.*2d 80.

We acknowledge that some courts have declined to adopt a bright line rule, resorting instead to a rule that was based on the "totality of the circumstances." *E.g., Stoddard, supra,* 537 *A.*2d at 456; *Luck, supra,* 472 *N.E.*2d at 1103; *Roeder, supra,* 768 *S.W.*2d

at 753; *State v. Beck,* 687 *S.W.*2d 155, 159 (Mo.1985). We rejected the "totality of the circumstances" approach in *Hartley, supra,* because it is not feasible to determine defendant's subjective state of mind. 103 *N.J.* at 268, 511 *A.*2d 80. The inherently coercive nature of incommunicado interrogations argues in favor of a clear principle to safeguard the presumption against the waiver of constitutional rights. *See Moran, supra,* 475 *U.S.* at 452, 106 *S.Ct.* at 1156–57, 89 *L.Ed.*2d at 440–41 (Stevens, J., dissenting); *Hartley, supra,* 103 *N.J.* at 261–63, 511 *A.*2d 80.

We also reject a "balancing approach" that weighs the cost of suppressing evidence of guilt against the value of the ancillary rights against self-incrimination. Such a balancing approach will always make the prophylactic rights appear minimal, marginal, or incremental. *Moran, supra,* 475 *U.S.* at 457, 106 *S.Ct.* at 1160, 89 *L.Ed.*2d at 444 (Stevens, J., dissenting).

We are satisfied that our holding will fully serve considerations of public policy and not undermine the proper and effective administration of criminal justice. The best response to the dissent's argument that the rule we announce will unduly complicate effective law enforcement, *post* at 280–281, 627 *A.*2d at 652–653, is that offered by Justice Stevens in his *Moran* dissent: "This argument is not supported by any reference to the experience in the states that have adopted this rule." 475 *U.S.* at 460, 106 *S.Ct.* at 1161, 89 *L.Ed.*2d at 446. Prior to *Moran,* a majority of states followed a rule similar to the one we enunciate today, without any apparent diminishment in the effectiveness of their law-enforcement agencies. In the states, since 1986, that have rejected *Moran* (e.g. Connecticut, Delaware, Florida, Oregon), no evidence exists that the police have been seriously hindered in their efforts to uphold the law.

Moreover, the dissent's attempt to problematize the. rule we announce today by posing questions about its operation in hypothetical situations, is a technique that could be deployed against any number of the well operating legal rules this Court and the United States Supreme Court have established. *E.g. Moran,*

supra, 475 *U.S.* at 461, n. 47, 106 *S.Ct.* at 1162, n. 47, 89 *L.Ed.*2d at 446, n. 47 (pointing out that the majority's "one-sided" interest in clarity of *Miranda* warnings failed to recognize that each warning, no matter how clearly and simply expressed, can be subjected to the criticism of unlimited uncertainty in its application) (Stevens, J., dissenting).

Virtually any rule is susceptible to a parade of hypothetical inquiries. The relevant question is whether the rule will, in actual practice, be readily and efficiently followed. We are convinced that the rule we announce today is justified both by the ease and the practicality with which it can be implemented.

The most significant consideration behind the rule is that the duty to inform a person held in custody of a specific opportunity to confer with a known lawyer is closely connected, both in logic and in experience, to the full effectuation of the privilege against self-incrimination. As we noted earlier, the right to counsel has been recognized as inextricably intertwined with the right against self-incrimination. "[I]t is not a generalized right to counsel that the decisions we have quoted enforce but, more concretely, the derivative right to the benefit of counsel's efforts to forestall involuntary and incriminating disclosures." *Haynes, supra,* 602 *P.*2d at 278. That right to counsel gives full force, "life and substance," to the right against self-incrimination and is essential to the effectuation of that right. We reject, therefore, the dissent's contention that the rule we enunciate today is unfairly biased against the "indigent defendant with no previous experience with law enforcement who is arrested while alone." *Post* at 279, 627 *A.*2d at 652. It is probably true that such a person will be less likely to have a lawyer contacted to see him or her. In an ideal world, every defendant would have the family, friends, financial means, time, energy, and personal resources to mount the best defense. But we do not live in an ideal world.

Regrettably, reality compels us to tolerate significant differences in the empirical operation of the constitutional rules we enunciate. Would anyone dispute, after all, that the Sixth amend-

ment right to counsel is experienced differently by a well educated defendant with access to any trial lawyer in the country and unlimited financial resources to present a defense, than by an illiterate and indigent defendant, without family or friends, who must rely on a highly competent and committed, but overworked; public defender? Yet we have never taken a disparity in the actual ability of differently-situated defendants to make use of a right as an argument against affording that right. Accordingly, the fact that not every suspect will benefit from the rule we announce today is no reason to deny the benefits of that rule to those suspects who may be advantaged by it.

## V

Our determination of the nature and application of the ancillary right to counsel directs the focus of future judicial inquiry, in this state, away from the assessment of the subjective level of coercion to which a suspect was exposed and toward an evaluation of objective police conduct. Although we have based our holding on our analysis of New Jersey's privilege against self-incrimination, such a focus—toward police conduct—invariably raises questions of due process.

In *Moran*, the United States Supreme Court, although noting that the "deliberate or reckless" withholding of information concerning an attorney's availability was ethically objectionable, found that such conduct fell "short of the kind of misbehavior that so shocks the sensibilities of civilized society" as to violate the Due Process Clause of the Fourteenth Amendment. 475 *U.S.* at 433–34, 106 *S.Ct.* at 1147, 89 *L.Ed.*2d at 428–29. Further, the Court concluded, "nothing in the Constitution vests in us the authority to mandate a code of behavior for state officials wholly unconnected to a federal right or privilege." *Id.* at 425, 106 *S.Ct.* at 1143, 89 *L.Ed.*2d at 423.

Justice Stevens, in dissent, remarked that in other circumstances the Court had given a more thoughtful consideration to the due-process requirement than a mere "shock the conscience"

test. According to Justice Stevens, federal precedent demonstrates that the principles behind due process require "fairness, integrity and honor in the operation of the criminal justice system and in its treatment of the citizens' cardinal constitutional protections." *Id.* at 466–67, 106 *S.Ct.* at 1165, 89 *L.Ed.*2d at 450.

Our own views of due process underscore the great weight given to considerations of reasonableness, fairness, and judicial integrity that collectively define the bounds of tolerable police conduct. *E.g.*, *State v. Johnson,* 127 *N.J.* 458, 606 *A.*2d 315 (1992). In this case, the inquiry into the applicability of due-process protections must be whether the police conduct in defendant's case was so egregious as to violate due process under our State Constitution.

■ We now hold, however, that the failure of the police to inform defendant that an attorney was present and asking to speak with him violated defendant's State privilege against self-incrimination. We decline, therefore, to resolve the issue of whether the police conduct was so egregious as to offend the due-process guaranteed by our State Constitution. Nevertheless, the police conduct in this case illustrates the close correlation between police conduct that can increase the inherently coercive atmosphere of custodial interrogation and conduct that is excessive, shocking, and fundamentally unfair and therefore violative of due process.

We are presented with a prosecutor misstating to an attorney retained to represent a client that the client was a witness not a suspect, and refusing to allow that attorney access to the client, thus violating the rules of his profession.[4] In turn, the police hurried defendant down a back stairway to prevent defendant from seeing his girlfriend or the attorney retained to represent him. This, in turn, prompted the police to aver that taking four

---

[4] Our own *Rules of Professional Conduct* state as a "special responsibility of a prosecutor" the duty to "make reasonable efforts to assure that the accused has been advised of the right to, and the procedure for obtaining, counsel and has been given reasonable opportunity to obtain counsel." *RPC* 3.8(b).

flights of stairs to exit a building was "more convenient" than using the elevator next to which defendant's girlfriend was coincidentally sitting. We think that in this case the law-enforcement officers were under great pressure to secure a confession. To prevent defendant from speaking with his attorney, the police engaged in conduct that, if not egregious, exemplifies the ways in which the inherently coercive atmosphere of custodial interrogation can be materially increased in the efforts to obtain a confession.

*Miranda* details, at some length, the "third degree" techniques—types of crude coercion—that ill befit a free society. See 384 *U.S.* at 445–59 nn. 5–25, 86 *S.Ct.* at 1613–20 nn. 5–25, 16 *L.Ed.*2d at 707–14, nn. 5–25. Defendant's case reminds us, as Chief Justice Warren observed, that "[w]e sometimes forget how long it has taken to establish the privilege against self-incrimination, the sources from which it came and the fervor with which it was defended." *Id.* at 458, 86 *S.Ct.* at 1619, 16 *L.Ed.*2d at 714. Although we withhold judgment on whether police conduct, in defendant's case, violated the demands of due process, we do not hesitate to observe that police and prosecutorial behavior, in denying defendant access to counsel, did not well serve the investigative function. Such conduct does not promote public esteem for the law, and it substantially increases the possibility that a suspect's confession will be involuntary. At a minimum, such conduct must not be encouraged by the courts.

## VI

Accordingly, we hold today that when, to the knowledge of law-enforcement officers, an attorney has been retained on behalf of a person in custody on suspicion of crime and is present or readily available to assist that person, the communication of that information to the suspect is essential to making a knowing waiver of the privilege against self-incrimination, and withholding that information renders invalid the suspect's waiver of the privilege against self-incrimination.

The judgment of the Appellate Division reversing defendant's murder conviction is affirmed. The judgment of the Appellate Division affirming defendant's conviction for aggravated criminal sexual contact is reversed, and the matter is remanded for proceedings consistent with this opinion.

STEIN, J., concurring.

I concur in the judgment of the Court. I write separately to advance a related but distinct basis for the requirement that the police inform a suspect of the presence or availability of "an attorney when the suspect's family or friends have retained the attorney or where the attorney has represented or is representing the suspect on another matter * * * and the attorney has communicated a desire to confer with the suspect * * *." *Ante* at 262, 627 *A*.2d at 643. In my view, if the police withhold from the suspect information that a retained attorney is present and available, the suspect's subsequent waiver of the privilege against self-incrimination, absent special circumstances, would be invalid. Without the suspect being informed of the attorney's presence and availability, the waiver of the privilege ordinarily could not satisfy the requirement that a waiver be knowingly and intelligently exercised.

I

To be valid, a waiver of the right to counsel during a custodial interrogation must be voluntary, knowing, and intelligent. *State v. Hartley*, 103 *N.J.* 252, 260, 511 *A*.2d 80 (1986). The validity of the waiver depends on "the particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused." *Johnson v. Zerbst*, 304 *U.S.* 458, 464, 58 *S.Ct.* 1019, 1023, 82 *L.Ed.* 1461, 1466 (1938). The totality of the circumstances must demonstrate that the waiver was made "with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v.*

*Burbine,* 475 *U.S.* 412, 421, 106 *S.Ct.* 1135, 1141, 89 *L.Ed.*2d 410, 421 (1986).

As the majority notes, *ante* at 247, 627 *A.*2d at 635, the United States Supreme Court in *Moran, supra,* held that a suspect's waiver was valid even though the police did not inform the suspect of an attorney's efforts to reach him. 475 *U.S.* at 434, 106 *S.Ct.* at 1147, 89 *L.Ed.*2d at 429. With respect to the validity of the waiver, the Court concluded:

> Events occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right. ˟ * * No doubt the additional information would have been useful to respondent; perhaps even it might have affected his decision to confess. But we have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights.
>
> [*Id.* at 422, 106 *S.Ct.* at 1141, 89 *L.Ed.*2d at 421.]

The majority decision in *Moran* stands in sharp contrast to "[t]he near-consensus of state courts," *id.* at 442, 106 *S.Ct.* at 1152, 89 *L.Ed.*2d at 434 (Stevens, J., dissenting), that prior to *Moran* had excluded from evidence any statement obtained after a suspect had waived his rights when the police had kept from the suspect the fact that an attorney had been retained or had attempted to reach him. Of those state courts, a great many determined that informing a suspect of the presence or availability of an attorney was necessary for the waiver to be knowing and intelligent. *Moran, supra,* 475 *U.S.* at 454–55 nn. 40–41, 106 *S.Ct.* at 1159 nn. 40–41, 89 *L.Ed.*2d at 442–43 nn. 40–41 (Stevens, J., dissenting). As expressed by the Oregon Supreme Court:

> To pass up an abstract offer to call some unknown lawyer is very different from refusing to talk with an identified attorney actually available to provide at least initial assistance and advice, whatever might be arranged in the long run. A suspect indifferent to the first offer may well react quite differently to the second.
>
> [*State v. Haynes,* 288 *Or.* 59, 602 *P.*2d 272, 278 (1979), *cert. denied,* 446 *U.S.* 945, 100 *S.Ct.* 2175, 64 *L.Ed.*2d 802 (1980).]

Justice Stevens, dissenting in *Moran, supra,* was "deeply disturb[ed]" by the majority's perfunctory rejection of the widely held view of the state courts. 475 *U.S.* at 439, 106 *S.Ct.* at 1150, 89 *L.Ed.*2d at 432. Justice Stevens agreed with those state

decisions that had invalidated a waiver given in ignorance of the presence or availability of an attorney. *Id.* at 454–55, 106 *S.Ct.* at 1158–59, 89 *L.Ed.*2d at 442–43. In his view, the presence of an attorney was a "critical fact," *id.* at 453, 106 *S.Ct.* at 1157, 89 *L.Ed.*2d at 441, that had a "direct bearing on the knowing and intelligent waiver of constitutional rights." *Id.* at 456, 106 *S.Ct.* at 1159, 89 *L.Ed.*2d at 443.

After *Moran,* state courts continued to hold that the police were obligated to inform a suspect of an attorney's efforts to reach him or her. The majority accurately notes that varying rationales have been offered to support that obligation. *Ante* at 253–254, 627 *A.*2d at 638–639. Several courts, however, even when relying on other grounds, have expressed the view that the information is critical to whether the suspect's waiver was knowing and intelligent. *See Bryan v. State,* 571 *A.*2d 170, 176 (Del.1990) ("Our holding simply recognizes that to knowingly, voluntarily and intelligently waive this right a defendant must be informed that his counsel has attempted or is attempting to render legal advice or perform legal services on his behalf."); *State v. Stoddard,* 206 *Conn.* 157, 537 *A.*2d 446, 453 (1988) (relying on State Constitution's due process clause and stating that "[w]e are unwilling, however, to dismiss counsel's effort to communicate as constitutionally insignificant to the capacity of the suspect to make a knowing and intelligent choice whether he or she will invoke the right to counsel."); *People v. Houston,* 42 *Cal.*3d 595, 230 *Cal. Rptr.* 141, 724 *P.*2d 1166, 1174 (1986) (relying on State constitutional right to counsel during custodial interrogation and during "critical stage" of proceedings against defendant, and adhering to reasoning of *Moran* dissent and "overwhelming majority of state courts which have addressed the issue") (*overruled by constitutional amendment, see People v. Ledesma,* 204 *Cal.App.*3d 682, 251 *Cal.Rptr.* 417, 420–22 (1988)).

## II

In *Miranda v. Arizona,* 384 *U.S.* 436, 479, 86 *S.Ct.* 1602, 1630, 16 *L.Ed.*2d 694, 726 (1966), the United States Supreme Court

imposed on law-enforcement officials the obligation of informing suspects subject to custodial interrogation of the "right to the presence of an attorney." Informing the suspect of that right was thought to be necessary "to dispel the compulsion inherent in custodial surroundings * * *." *Id.* at 458, 86 *S.Ct.* at 1619, 16 *L.Ed.*2d at 714. The attorney possesses the "unique ability to protect the Fifth Amendment rights of a client undergoing custodial interrogation." *Fare v. Michael C.*, 442 *U.S.* 707, 719, 99 *S.Ct.* 2560, 2568–69, 61 *L.Ed.*2d 197, 208 (1979) (discussing *Miranda, supra*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694). The attorney's presence guards against overreaching by law-enforcement officials and insures that any statements that the suspect offers are accurately recorded. *Id.*, 442 U.S. at 719, 99 *S.Ct.* at 2569, 61 *L.Ed.*2d at 208–09. Moreover, the attorney is "uniquely prepared to assist a suspect in making an intelligent and knowing decision whether to speak or stand mute * * *." *Stoddard, supra*, 537 *A.*2d at 452.

Those principles apply with equal force to our State's common-law privilege against self-incrimination and the concomitant right to the presence of an attorney. *See State v. Kennedy*, 97 *N.J.* 278, 285, 478 *A.*2d 723 (1984). Because the attorney plays a vital role during a custodial interrogation, the administration of the *Miranda* warnings is a minimum safeguard imposed to ensure that the suspect's rights are not violated. The *Miranda* warnings do not guarantee that a subsequent waiver will be valid. *See, e.g., Edwards v. Arizona*, 451 *U.S.* 477, 101 *S.Ct.* 1880, 68 *L.Ed.*2d 378 (1981); *Hartley, supra*, 103 *N.J.* 252, 511 *A.*2d 80. The warnings must convey to the suspect information necessary to provide a "full awareness" of the nature of the right being relinquished. *Moran, supra*, 475 *U.S.* at 421, 106 *S.Ct.* at 1141, 89 *L.Ed.*2d at 421.

That "any lawyer worth his salt will tell the suspect in no uncertain terms to make no statement to police under any circumstances," *Watts v. Indiana*, 338 *U.S.* 49, 59, 69 *S.Ct.* 1357, 1358, 93 *L.Ed.* 1801, 1809 (1949) (Jackson, J., concurring), does not oblige the police to advise the suspect to remain silent. The police are

not required to probe the suspect's subjective expectations and understanding, *State v. Adams,* 127 *N.J.* 438, 449, 605 *A.*2d 1097 (1992), nor are they required to provide "a flow of information to help him calibrate his self-interest * * *." *Moran, supra,* 475 *U.S.* at 422, 106 *S.Ct.* at 1141, 89 *L.Ed.*2d at 421.

However, informing a suspect of the right to the presence of an attorney is qualitatively different from informing a suspect of both the right to the presence of an attorney and that the attorney is already in the stationhouse. In the first instance, the suspect may reject the offer out of fear that the police will interpret the request for an attorney as an acknowledgment of guilt, or the suspect may view with skepticism the offer by police to provide an unknown attorney. But if the attorney is already present, the same suspect may conclude that consultation with the attorney outweighs any risk of antagonizing the police, particularly if the suspect has had a prior relationship with the attorney or if friends or family have retained the attorney. Thus, the presence and availability of a retained attorney is critical information that qualitatively affects the exercise by a suspect of the right to consult with counsel. When that information is withheld, the suspect's waiver of the right to counsel and to remain silent is more abstract than real, becoming, in effect, a waiver of a theoretical right that is uninformed by the material knowledge that retained counsel, present and available to assist the suspect in the full exercise of his or her rights, is just outside the door. That the suspect may ultimately reject the offer and waive his or her right is irrelevant to whether the uninformed waiver is knowing and intelligent. *Cf. Kennedy, supra,* 97 *N.J.* at 287–89, 478 *A.*2d 723 (holding that defendant who consulted with attorney may subsequently waive right to presence of that attorney during custodial interrogation).

Under different circumstances, courts have limited the scope of the information that police are required to give to a suspect contemplating a waiver of the right to remain silent. For example, in *Colorado v. Spring,* the United States Supreme Court held that a suspect's waiver was not invalid simply because the police

failed to inform the suspect of the subject matter of the interrogation. 479 *U.S.* 564, 572–75, 107 *S.Ct.* 851, 856–58, 93 *L.Ed.*2d 954, 964–66 (1987). Nor is a suspect necessarily entitled to be informed prior to a custodial interrogation that he or she is a target of the investigation. *See State v. Hollander,* 201 *N.J.Super.* 453, 483–84, 493 *A.*2d 563 (App.Div.), *certif. denied,* 101 *N.J.* 335, 501 *A.*2d 983 (1985); *see also Oregon v. Elstad,* 470 *U.S.* 298, 317, 105 *S.Ct.* 1285, 1297, 84 *L.Ed.*2d 222, 237 (1985). ("[W]e have not held that the sine qua non for a knowing and voluntary waiver of the right to remain silent is a full and complete appreciation of all of the consequences flowing from the nature and the quality of the evidence in the case.").

Similarly, police do not have a "duty to probe for a defendant's unstated misconceptions about the effect of the waiver of Fifth Amendment rights." *Adams, supra,* 127 *N.J.* at 449, 605 *A.*2d 1097; *see also Oregon v. Elstad, supra,* 470 *U.S.* at 316, 105 *S.Ct.* at 1297, 84 *L.Ed.*2d at 237 ("This Court has never embraced the theory that a defendant's ignorance of the full consequences of his decisions vitiates their voluntariness."). In *Adams,* the defendant, whom the police were about to interrogate, wrote on a consent form that he did not wish to give a written statement at that time, but indicated that he would talk about the incident in question, and then described his involvement in the crime. 127 *N.J.* at 442, 605 *A.*2d 1097. The police officer had informed defendant that the oral statement would be included in his report. *Id.* at 443, 605 *A.*2d 1097. We concluded that the officer was not obligated to dispel defendant's misunderstanding regarding the effect of defendant's waiver. *Id.* at 449–450, 605 *A.*2d 1097; *see also State v. McKnight,* 52 *N.J.* 35, 46–47, 243 *A.*2d 240 (1968) (rejecting defendant's claim that waiver was invalid because he thought statement could not be used against him unless written and signed); *cf. State v. Freeman,* 223 *N.J.Super.* 92, 104, 538 *A.*2d 371 (App.Div.1988) (concluding that waiver was voluntary and knowing even though defendant thought that by crossing out words "accused or suspect" on waiver card, he could not have been waiving any constitutional rights); *State v. Canola,* 135 *N.J.Super.*

224, 231, 343 *A*.2d 110 (App.Div.) (describing as "untenable" defendant's claim that waiver was not knowing and intelligent because he did not understand felony-murder doctrine), *certif. denied*, 69 *N.J.* 82, 351 *A*.2d 10 (1975), *modified on other grounds*, 73 *N.J.* 206, 374 *A*.2d 20 (1977).

Those cases dealt with issues significantly different from the one before us. The presence or availability of an attorney is not simply information that a defendant might find useful in "calibrat[ing] his self-interest [and] deciding whether to speak or stand by his rights." *Moran, supra,* 475 *U.S.* at 422, 106 *S.Ct.* at 1141, 89 *L.Ed.*2d at 421. As Justice Stevens stated, an attorney's actual presence or availability is a critical fact "that has a direct 'bearing' on the knowing and intelligent waiver of constitutional rights." *Id.* at 456, 106 *S.Ct.* at 1159, 89 *L.Ed.*2d at 443. Nor is this a case in which the suspect "stub[bed] his toe," *McKnight, supra,* 52 *N.J.* at 52, 243 *A*.2d 240, by waiving a right under the misapprehension of the effect of that waiver, *Adams, supra,* 127 *N.J.* at 449–50, 605 *A*.2d 1097, or by waiving the right to counsel after a consultation, *Kennedy, supra,* 97 *N.J.* at 289, 478 *A*.2d 723. The police's misrepresentation to Reed related not to extrinsic facts that might affect matters of strategy, but instead to facts that directly affected the availability of his right to consult with counsel before talking with the police. By withholding from Reed that objective information—the attorney's efforts to reach the suspect—the police deprived Reed of "a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran, supra,* 475 *U.S.* at 421, 106 *S.Ct.* at 1141, 89 *L.Ed.*2d at 421.

Because I would focus essentially on whether the suspect's waiver of the privilege against self-incrimination was knowing and intelligent if exercised when information about the presence of retained counsel has been withheld, I would avoid the imposition of a bright-line rule holding that waivers tendered under such circumstances are invalid *per se. Ante* at 261–262, 627 *A*.2d at 642–643. Preferably, the Court should adhere to the settled principle that the waiver's validity "depend[s], in each case, upon

the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Johnson v. Zerbst, supra,* 304 *U.S.* at 464, 58 *S.Ct.* at 1023, 82 *L.Ed.* at 1466. Applying that standard, I would conclude that defendant's waiver was not knowing and intelligent because the police officers did not inform him of his attorney's presence.

Accordingly, I concur in the judgment of the Court reversing defendant's conviction and remanding the case for retrial.

CLIFFORD, J., dissenting.

Defendant confessed to the murder of Susan Green, who died after suffering fifty-three stab wounds. The Court concludes that the trial court erred in admitting defendant's confession into evidence because the failure of the police to inform defendant that an attorney was present and asking to speak with him violated defendant's State privilege against self-incrimination. *Ante* at 261–262, 627 *A.*2d at 642–643. I disagree and therefore dissent.

The importance of the right to counsel in protecting suspects against compelled self-incrimination can hardly be overstated. This Court has traditionally been most solicitous of that right. We have determined that *any indication* of a suspect's desire for counsel—even if not articulate, clear, or explicit—triggers the right. But today the Court extends that treasured right even farther, concluding that the right to counsel can attach *even if a suspect expressly and voluntarily waives that right.* That goes too far.

The majority neatly summarizes the import of the New Jersey common-law right against self-incrimination:

At its core, the privilege against self-incrimination means that "[i]n New Jersey, no person can be compelled to be a witness against himself." A suspect has an absolute right to remain silent while under police interrogation, and at trial the State may draw no negative inference from that silence. Waiver of that right must be knowing, intelligent, and voluntary. In demonstrating that a defendant has waived his or her right against self-incrimination the government bears the burden of proof and that burden is a heavy one.

[*Ante* at 250, 627 *A.*2d at 637 (citations omitted).]

However, the law does not—and should not—require that police inform a suspect of the relative ease with which that right can be exercised in certain circumstances.

The majority concludes that because defendant, Reed, was unaware of the presence of an attorney seeking to communicate with him, he could not knowingly, voluntarily, and intelligently waive the right to counsel, an ancillary right to the right against self-incrimination. However, the failure of the police to impart that information had absolutely no effect on the voluntariness of defendant's waiver of his right to counsel. The right to counsel requires that a suspect be told that he or she has the right to an attorney, that an attorney will be provided if the suspect cannot afford one, that the suspect be clearly informed of the right to ask for counsel at any time during custodial interrogation, and that interrogation will cease at any time the suspect desires counsel. *Ante* at 253, 627 *A.*2d at 638.

Reed, a quality-control inspector whose work required the reading of complex manuals and engineering drawings, understood that he had the right to an attorney. He understood that an attorney would be provided if he could not afford one. He understood that he could ask for counsel at any time during the investigation and that the interrogation would cease at that point. Fully understanding all of the foregoing, defendant waived those rights—three times. Therefore, the failure to inform defendant of attorney Aitken's desire to communicate cannot be viewed as a violation of defendant's *Miranda* rights. And it should not be viewed as contrary to New Jersey's equivalent common-law protections.

In *Moran v. Burbine,* 475 *U.S.* 412, 106 *S.Ct.* 1135, 89 *L.Ed.*2d 410 (1986), the United States Supreme Court set forth the reasons why failing to inform a suspect that an attorney seeks to communicate with him does not render the suspect's waiver of the right to counsel involuntary:

> Events occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right. Under the analysis of the Court of Appeals, the

same defendant, armed with the same information and confronted with precisely the same police conduct, would have knowingly waived his *Miranda* rights had a lawyer not telephoned the police station to inquire about his status. Nothing in any of our waiver decisions or in our understanding of the essential components of a valid waiver requires so incongruous a result. No doubt the additional information would have been useful to respondent; perhaps even it might have affected his decision to confess. But we have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights.

[*Id.* at 422, 106 *S.Ct.* at 1141, 89 *L.Ed.*2d at 421.]

I would adopt the Supreme Court's reasoning.

Philosophical as well as practical concerns lead me to disagree with my colleagues' conclusion. First, I agree with the state court in *State v. Burbine*, 451 *A*.2d 22, 28 (R.I.1982), that a mentally-competent person's constitutional rights may be asserted only by that person. Therefore, I part company with the Court in its conclusion that a third party—in this case, the attorney in waiting—can assert a suspect's right against self-incrimination. See *ante* at 261, 627 *A*.2d at 643.

Moreover, the Court's rule creates an illogical or unfair advantage for some suspects. Those suspects who are taken into custody in the presence of others, or who have previously obtained a private attorney, or who have previously required the services of a public defender—and therefore are more likely to be the beneficiaries of someone's call to an attorney on their behalf—will be found to have been coerced if not alerted should an attorney arrive at the station house. On the other hand, the indigent defendant with no previous experience with law enforcement who is arrested while alone—and hence "out of the loop" as far as legal assistance is concerned—although subjected to identical interrogation techniques will have knowingly and voluntarily waived the right to counsel. The rule therefore results in two classes of suspects and favors those who are more likely to have access to counsel. Such intolerable incongruities result when the emphasis shifts to *events* entirely unrelated to the suspect's knowledge rather than focusing on the sole person who matters in evaluating the validity of a suspect's waiver—the *suspect.*

Furthermore, the rule the Court fashions today risks increasing the likelihood of police coercion. Police officers of flexible rectitude who know that the right to question a suspect may terminate once an attorney makes known his or her availability to assist a suspect may be tempted to "turn up the heat" to secure a confession in what the officers may perceive as a limited window of opportunity. The right the Court creates intensifies rather than diminishes the pressure on law-enforcement officers to cut corners in the effort to extract an incriminating statement.

Likewise, the duty of police to inform a suspect that an attorney seeks to communicate with the suspect raises a number of other issues that the Court will surely need to address before long. For example, how quickly must the police relay the information that an attorney is available? If an attorney calls the police station, is the officer receiving the call obliged immediately to put aside all other matters and race to inform the investigating officers? Does the right attach at the time of communication or at some reasonable time thereafter? If the suspect should blurt out a confession a moment before an officer seeking to impart the availability of counsel enters the room, does the statement become retroactively involuntary even though the police have made every effort to honor a defendant's rights? The Court suggests precisely that when it holds that "[w]hen, to the knowledge of police, such an attorney is present or available, and the attorney has communicated a desire to confer with the suspect, the police must make that information known to the suspect before custodial interrogation can proceed or continue." *Ante* at 262, 627 *A.*2d at 643. In that instance, the admissibility of a suspect's confession may well turn on the time affixed to a telephone message.

Also, what duty do police officers have to provide full and accurate information concerning the attorney's identity? A suspect may wish to see a private-practice attorney retained by his mother but have no enthusiasm for the advice of a public defender retained by a casual acquaintance. A hastily-dispatched associate in a law firm may not know who telephoned the associate's law firm or be familiar with the caller's relationship to the suspect.

Resume-checking duties should not fall on the police department. And we will eventually have to wrestle with the nasty little issue of whether a negligent misstatement of the information concerning that attorney would have any effect on a subsequent waiver.

The possibilities multiply. An attorney seeking to delay interrogation of a suspect may assert immediate or almost-immediate availability. Is an attorney "immediately available" in any circumstance other than one in which the attorney can *at that very moment* proceed to the scene of the interrogation or speak with a defendant? What if an attorney calls to profess availability and thereafter does not appear for several hours? Must the attorney retained communicate with the police, or may another person at a firm or the person who has arranged for the attorney alert the police of the attorney's availability?

This State has developed a coherent and easily-applied body of self-incrimination law that apprises suspects of their rights and police officers of their duties in respect of custodial interrogation. In departing from those well-established principles, the Court in this case sacrifices certainty to return to this defendant a right that he had expressly rejected. As one can tell from my hand-wringing above, I believe that the problems created by today's rule far outweigh the societal benefits.

I need hardly add that my resolution of this case in no way constitutes an endorsement of the deplorable bumbling of the law-enforcement personnel who lied to Ms. Varga and Aitken and who scurried through the basement to hide defendant from the attorney who sought to confer with him. I join the majority in its denouncement of such foolishness. However, I do not share the Court's confidence that its requirement that the police inform a suspect of an attorney's availability will "diminish the likelihood of unreasonable police conduct" similar to the actions of the police in this case. *Ante* at 260, 627 *A*.2d at 642. If police have no duty to inform a suspect of an attorney's presence if the suspect does not request counsel, we need not fear similar police conduct in the future because the defendant will have no right to see the waiting

attorney absent a request for counsel. The police therefore would have no need to move the suspect. Because protecting against unreasonable police conduct is achieved by either rule, the majority's decision therefore serves one purpose—"to enhance the reliability of confessions by reducing the inherent coercion of custodial interrogation." *Ante* at 260, 627 *A*.2d at 642. In my view that purpose is adequately served by careful administering of the *Miranda* warnings, fully complied with in this case, and punctilious observance of the procedures laid out in our case law.

To trigger his right to counsel, defendant had to do no more than make some expression of a desire for a lawyer. He did not do so, and therefore the police had no duty to inform him of Aitken's wish to communicate with him. On the retrial I would therefore permit defendant's confession to be received in evidence.

STEIN, J., concurring in the result.

*For affirmance in part; for reversal in part; for remandment*—Chief Justice WILENTZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN-6.

*For reversal*—Justice CLIFFORD-1.