NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-2485-19

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

LAUREN M. DORFF,
a/k/a LAUREN DORFF,

      Defendant-Appellant.

_____

| APPROVED FOR PUBLICATION |
| :---: |
| **July 20, 2021** |
| **APPELLATE DIVISION** |

Submitted May 17, 2021 – Decided July 20, 2021

Before Judges Fasciale, Mayer and Susswein.

On appeal from the Superior Court of New Jersey, Law Division, Cape May County, Indictment No. 18-10-0804.

Neil Law Practice, attorneys for appellant (John R. Stein, of counsel; Durann Neil, Jr., on the brief).

Jeffrey H. Sutherland, Cape May County Prosecutor, attorney for respondent (Gretchen A. Pickering, Senior Assistant Prosecutor, of counsel and on the brief).

The opinion of the court was delivered by

SUSSWEIN, J.A.D.

Defendant, Lauren M. Dorff, appeals from her guilty plea conviction for first-degree strict liability for drug-induced death. She contends the trial court erred by denying her motion to suppress statements she gave to police during two separate stationhouse interrogations. During the first interrogation session, defendant admitted she obtained money from the victim on the day he died but claimed she had borrowed the money and denied selling him drugs or having any involvement in his overdose death. Defendant contends her first interrogation statement was given involuntarily. During the second interrogation session, defendant eventually admitted she sold the victim controlled dangerous substances (CDS) prior to his fatal overdose. She asserts that admission was made only after the interrogating detectives failed to honor her repeated requests to speak to an attorney.

After carefully reviewing the record in view of the applicable legal principles, we affirm the trial court's ruling that defendant's first statement was voluntarily made and admissible. However, we conclude defendant's Miranda[1] rights were violated during the second stationhouse interrogation when a detective told her that if she did not do anything wrong, she did not need an attorney. That offhand advice—made in the context of responding to

_____

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

A-2485-19

defendant's uncertainty as to whether she should speak to an attorney—arrogated one of the fundamental tenets of <u>Miranda</u> and undercut the warnings that had been read to her at the start of the interrogation session by impermissibly burdening the right to counsel. We therefore are constrained to reverse that part of the trial court's order denying defendant's motion to suppress the statement given at the second interrogation.

I.

In October 2018, a Cape May County grand jury indicted defendant for third-degree possession of CDS with intent to distribute, N.J.S.A. 2C:35-5(a)(1) and 2C:35-5(b)(5), and first-degree strict liability for drug-induced death, N.J.S.A. 2C:35-9(a).[2] In April 2019, defendant moved to suppress statements she made to law enforcement during interrogations conducted on July 22, 2018 and August 10, 2018. On June 6, 2019, the trial court convened an evidentiary hearing at which the detectives who conducted the interrogations testified and the video recordings of the interrogation sessions were played back. On July 11, 2019, the trial court rendered a written opinion denying defendant's motion.

---

[2] The indictment also charged two other individuals for their roles in distributing the CDS that eventually caused the victim's overdose death. They are not parties to this appeal.

On November 21, 2019, defendant pled guilty to the count charging strict liability for drug-induced death.[3]  In exchange for the guilty plea, the State agreed to recommend a sentence of eight years in prison, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.

We briefly recount the facts relevant to this appeal, focusing on portions of the second interrogation when defendant repeatedly referred to her right to consult with an attorney.  On July 21, 2018, the victim, Eric Nolan, was discovered dead of an apparent drug overdose.  Defendant and the victim shared a child together and had an on-off relationship spanning many years.

---

[3]  We note the record before us does not include a transcript of the plea hearing. The handwritten plea form included in the State's appendix does not indicate that defendant expressly preserved the right to challenge the denial of her motion to suppress her statements. See State v. Knight, 183 N.J. 449, 470 (2005) ("Generally, a defendant who pleads guilty is prohibited from raising, on appeal, the contention that the State violated his [or her] constitutional rights prior to the plea." (quoting State v. Crawley, 149 N.J. 310, 316 (1997))); cf. R. 3:9-3(f) (authorizing conditional pleas only with the consent of the court and prosecutor), and R. 3:5-7(d) (automatically preserving a defendant's right to challenge denial of a motion to suppress physical evidence).

However, the State does not argue on appeal that defendant is prohibited from raising the contention that her Fifth Amendment rights were violated during the interrogation sessions; rather, the State only argues in its letter brief that the motion to suppress was properly denied on the merits. Accordingly, we deem the State to have waived any argument that defendant's Fifth Amendment contentions were not preserved for appellate review. See Sklodowsky v. Lushis, 417 N.J. Super. 648, 657 (App. Div. 2011) ("An issue not briefed on appeal is deemed waived.").

The first interrogation was conducted on July 22, 2018 at the Lower Township police station by a Lower Township Police Department (LTPD) detective and a Cape May County Prosecutor's Office (CMCPO) detective. The second interrogation was conducted on August 10, 2018 at the Cape May County Prosecutor's Office by those same detectives. Both stationhouse interrogations were electronically recorded in accordance with Rule 3:17. The detectives read defendant her Miranda rights and on both occasions presented her with a written form memorializing those rights.

During the first interrogation, defendant admitted that she and the victim had once been romantically involved, they had a child together, and they both suffered from opiate addiction. She also acknowledged she obtained money from the victim on the day of his overdose, though she claimed it was a loan and not the proceeds of a drug transaction. She denied any involvement in Nolan's death, and maintained she had not sold him the pills that led to the fatal overdose. At the end of the first interrogation, the detectives informed defendant they were taking her cellphone to search it. Defendant complied with their request for the passcode to unlock the phone and access its stored data.[4]

---

[4] Defendant does not contest the seizure of the phone, the demand for the passcode, or the search of the data stored in the phone.

At the second interrogation, immediately after the Miranda warnings were administered, defendant made several references to the need for her to have an attorney. To facilitate our analysis, we excerpt and reproduce each reference and the colloquy that followed:[5]

First Reference

LTPD Detective: Okay. Today's date is August 10th, 2018. The time now is 07:02 hours. We're at the Cape May County Prosecutor's Office.

Defendant: Do I need to get a lawyer?[6]

LTPD Detective: That's up to you. I can't give you legal advice if you want an attorney or not. But we wanna speak to ya today about this so.

Second Reference

---

[5] Our independent review of the record reveals several significant disparities between the transcript of the video-recorded August 10, 2018 interrogation that was marked as Exhibit S-6 and the transcript of the July 6, 2019 suppression hearing at which the video recording of the interrogation was played in open court and audio-recorded on CourtSmart. Neither the State nor defendant mention these disparities in their appellate submissions. Presumably, the transcript of the interrogation session that was introduced as an exhibit was reviewed by the parties before the suppression hearing and is accurate. In its July 11, 2019 written opinion, moreover, the trial court cites to and analyzes the transcript of the interrogation marked as Exhibit S-6. Accordingly, we rely on that version as well. We indicate in footnotes the differences between the two transcriptions to the extent those disparities might be relevant to the fact-sensitive issues raised on appeal.

[6] The transcript of the suppression hearing reads: "Can I maybe get a lawyer." This disparity between the two transcriptions is significant. See infra note 9.

| | |
|---|---|
| Defendant: | I don't know how, how to trust you guys. |
| CMCPO Detective: | Well how—(inaudible)—the story. Here's how it goes— |
| Defendant: | That's why I feel I might need a lawyer. |
| CMCPO Detective: | Well, I mean that's a decision you need to make. |
| Defendant: | You know that scares me too. |
| CMCPO Detective: | But if you didn't do anything, you certainly don't need to have, I mean that's—[7] |
| Defendant: | I didn't. I feel like I didn't do anything wrong. |
| CMCPO Detective: | But that's how—(inaudible). |
| Defendant: | But it's like still scary this whole situation. The fact that I don't know, you know like maybe I need a lawyer. |
| CMCPO Detective: | That's, that's something you have to decide. That's a decision we can't influence you either way. But—(inaudible). |

Third Reference

| | |
|---|---|
| CMCPO Detective: | You have two children you have to think about. |

---

[7] The transcript of the suppression hearing reads: "That's a decision you have to make. But if you didn't do anything wrong you certainly don't need to have one. I mean that's—." See infra note 11 (discussing the disparity between the two transcription versions).

A-2485-19

| | |
|---|---|
| Defendant: | Yeah and that's why I feel like I need a lawyer. |
| CMCPO Detective: | You have to make that decision and you have to—and that's a decision before we move forward you have to make. |

Fourth Reference

| | |
|---|---|
| CMCPO Detective: | And we already, we know what happened. I told ya we have—there's a lot and there's gonna be more information coming forward in the next short amount of time and you know that as well as I do. So this is, this is the most important part right now, is that you tell your side. And since— |
| Defendant: | Am I supposed to do that without a lawyer though? |
| CMCPO Detective: | Listen, I'm not going to talk about this lawyer anymore, you have to make a decision. You have to make a decision. I'm not—I can't answer for you one way or another.[8] You understand that right? |
| Defendant: | Yeah, I know. |
| CMCPO Detective: | And this is, this is, this is the grown up world. So now you have to make a decision one or the other. And your decision, the minute you tell if you want an attorney, that's fine you know. All our conversations stop. You can tell us you want to continue to talk to us and that's fine. Then our |

---

[8] The transcript of the suppression hearing reads: "I'm not—I can't influence you one way or the other."

A-2485-19

conversation is you get to tell your story and it's as simple as that. I can't—again I'm being very honest.

Defendant: I can help as much as I can until I feel uncomfortable. Can I then get a lawyer?

CMCPO Detective: You can, you can do—yeah. Just like you were told in—just the way you read it. You can talk and you can stop whenever you want to. That's up to you. Do you want to talk to us?

Defendant: As much as I, as much as I feel comfortable with yeah, if that's okay?

CMCPO Detective: That's fine. This is—these are your decisions. I'm not here to influence you one way or another. So here's the story, if you want to talk to us without an attorney. Is that what you want to do right now?

Defendant: Yeah, at the moment yes.

Following this last exchange, defendant admitted in response to questions that she provided the victim with pills that she believed to be Percocet, a CDS.

Defendant raises the following contentions for our consideration:

POINT I

THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION TO SUPPRESS HER STATEMENTS BECAUSE DEFENDANT DID NOT KNOWINGLY, INTELLIGENTLY, AND VOLUNTARILY WAIVE HER MIRANDA RIGHTS

9

PRIOR TO CUSTODIAL INTERROGATIONS (raised below).

POINT II

THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION TO SUPPRESS HER SECOND STATEMENT BECAUSE THE DETECTIVES FAILED TO SCRUPULOUSLY HONOR DEFENDANT'S INVOCATION OF RIGHT TO COUNSEL (raised below).

II.

We first address defendant's contention she did not knowingly, intelligently, and voluntarily waive her Miranda rights at the first stationhouse interrogation on July 22, 2018, and that her statement was involuntary considering the totality of the circumstances. She argues she had a prior personal relationship with the LTPD detective. She also claims the detectives coerced her to talk by interrupting her as she was making a relevant statement and by changing the subject to her children as she was speaking. We reject those contentions and affirm the admissibility of the statement made during the first interrogation session substantially for the reasons stated by the trial court in its written opinion. We add the following comments.

When reviewing the denial of a motion to suppress a statement, we apply a deferential standard of review to the trial court's findings of fact. State v. S.S., 229 N.J. 360, 379 (2017). We accept the trial court's factual findings

10                                                    A-2485-19

unless they are not supported by sufficient credible evidence in the record. Id. at 381 (citing State v. Gamble, 218 N.J. 412, 424 (2014)). In contrast, we review the trial court's legal conclusions de novo. Id. at 380. Accordingly, we are not bound by a trial court's interpretations of the legal consequences that flow from established facts. See Manalapan Realty L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995); State v. Harris, 457 N.J. Super. 34, 43–44 (App. Div. 2018).

In State v. P.Z., our Supreme Court recognized that although "Miranda established a per se rule to counteract the inherently coercive nature of custodial interrogations by law enforcement[,] it did not eliminate the due process requirement that all statements given during an interrogation must be voluntary." 152 N.J. 86, 113 (1997) (citing Miller v. Fenton, 474 U.S. 104, 109–10 (1985)). Accordingly, applying a "totality of the circumstances" analysis, both federal and New Jersey precedents require reviewing courts to consider whether the defendant's statements were "the product of an essentially free and unconstrained choice by [the defendant]," or instead "whether the defendant's will [was] overborne and his [or her] capacity for self-determination critically impaired." Id. at 113 (quoting Arizona v. Fulminante, 499 U.S. 279, 285–86 (1991), and Schneckloth v. Bustamonte, 412 U.S. 218, 225–26 (1973)); see also State v. A.M., 237 N.J. 384, 398 (2019) (listing

relevant factors that should be considered as part of the totality of the circumstances analysis (citing State v. Miller, 76 N.J. 392, 402 (1978))). Our review of police-obtained confessions for due process violations is "searching and critical" to ensure protection of a defendant's constitutional rights. State v. Patton, 362 N.J. Super. 16, 43 (App. Div. 2003) (citing State v. Pickles, 46 N.J. 542, 577 (1966)).

In this instance, the July 22, 2018 interrogation was video recorded in accordance with Rule 3:17. The trial court thus had the opportunity to observe what transpired, including the detectives' demeanor and defendant's deportment. See A.M., 237 N.J. at 401 (noting "that by videotaping their questioning of defendant, police permitted the [motion] court to review the interview and assess defendant's overall deportment and conduct as well as the officers' demeanor and conduct throughout the custodial interrogation").

The trial court found both detectives to be credible witnesses. The court specifically accredited the LTPD detective's testimony that his personal relationship was with the victim's family and not with defendant. The court thus concluded there was "no sort of relationship [between the LTPD detective and defendant] that would affect [d]efendant's understanding of what was taking place." We see no reason to disturb that finding.

12

The trial court also found that the <u>Miranda</u> warnings were properly administered; defendant at no time during the first interrogation made a request to speak to an attorney; defendant was alert and cogent; there was no indication she was exhausted or under the influence of drugs or alcohol; and "[t]he environment of the interview was business-like and in no way oppressive."

We accept those findings as well, as they are amply supported by credible evidence in the record. <u>S.S.</u>, 229 N.J. at 381.

Based on the totality of the circumstances, the trial court concluded that the State had established beyond a reasonable doubt that defendant knowingly, intelligently, and voluntarily waived her <u>Miranda</u> rights and that her July 22, 2018 statement was given voluntarily. Applying our de novo standard of review to the trial court's legal conclusions, <u>Harris</u>, 457 N.J. Super. at 43–44, we agree with the trial court that the statements defendant made at the first interrogation session were voluntary and admissible.

III.

We next address the circumstances relating to the second stationhouse interrogation during which defendant admitted she provided the victim with CDS. Defendant contends the detectives did not scrupulously honor her repeated requests to speak to an attorney. For the following reasons, we agree.

13

A.

The United States Supreme Court in <u>Miranda</u> devised the now-familiar warnings to safeguard the Fifth Amendment's guarantee of the privilege against self-incrimination. <u>Miranda</u>, 384 U.S. at 444, 468–72. The Supreme Court established a per se rule: the failure to properly administer the <u>Miranda</u> warnings, or the failure to honor an invocation of the right to remain silent or the right to speak to an attorney, generally requires the suppression of any resulting admission. <u>Id.</u> at 465. This rule is strictly enforced, especially under New Jersey law. As our Supreme Court noted in <u>State v. Bey</u>, "[a]lthough the United States Supreme Court has held that the state must prove admissibility of a confession by only a preponderance of the evidence, this Court has held that the State must prove admissibility beyond a reasonable doubt." 112 N.J. 123, 134 (1988) (citations omitted).

<u>Miranda</u> made clear that if the accused "indicates in any manner and at any stage of the process that he [or she] wishes to consult with an attorney before speaking there can be no questioning." 384 U.S. at 444–45. As the Court later emphasized in another landmark case, <u>Edwards v. Arizona</u>, once a request for counsel has been made, an interrogation may not continue until either counsel is made available or the suspect initiates further communication sufficient to waive the right to counsel. 451 U.S. 477, 484–85 (1981).

14

Not every reference to a lawyer, however, requires a halt to questioning. Reviewing courts must determine on a case-by-case basis whether the mention of counsel constitutes an invocation of the right to counsel. In making this determination, reviewing courts consider the totality of the circumstances, "including all of the suspect's words and conduct." State v. Diaz-Bridges, 208 N.J. 544, 569 (2011).

In State v. Alston, 204 N.J. 614 (2011), our Supreme Court carefully surveyed the relevant precedents and provided instruction on how to interpret a suspect's reference to counsel and the required police response to such a reference. The Court acknowledged it has followed a "different approach" than its federal counterpart when determining whether a request for counsel has been made, citing its decision in State v. Reed, 133 N.J. 237 (1993), where it held that "a suspect need not be articulate, clear, or explicit in requesting counsel; any indication of a desire for counsel, however ambiguous, will trigger entitlement to counsel." Id. at 621–22 (quoting Reed, 133 N.J. at 253) (citations omitted). The Alston Court also noted that "because the right to counsel is fundamental, courts interpret equivocal requests for counsel in the light most favorable to the defendant." Id. at 621 (quoting State v. McCloskey, 90 N.J. 18, 26 n.1 (1982)).

15

Alston further emphasized that "if the words amount to even an ambiguous request for counsel, the questioning must cease, although clarification is permitted; if the statements are so ambiguous that they cannot be understood to be the assertion of a right, clarification is not only permitted but needed." Id. at 624. The Court added that officers may not use their obligation to clarify the suspect's request by asking "questions that 'operate to delay, confuse, or burden the suspect in his [or her] assertion of his [or her] rights.'" Id. at 623–624 (quoting State v. Johnson, 120 N.J. 263, 283 (1990)). We interpret that important admonition to prohibit interrogating officers not only from posing questions that burden the suspect in asserting his or her rights, but also from offering advice or making comments that effectively burden the assertion of the suspect's right to speak with an attorney.

The Court in Alston closely examined—and ultimately embraced—the reasoning in our decision in State v. Messino, 378 N.J. Super. 559 (App. Div. 2005). In that case, the suspect asked the officer "[d]o you think I need a lawyer?" 387 N.J. Super. at 573. The officer replied by explaining "that was [the suspect's] call." Ibid. We rejected Messino's argument that his confession should be suppressed. Id. at 578. In reaching that conclusion, we distinguished two federal appellate decisions that each held that the defendants' references to attorneys constituted requests for counsel. Ibid. In

16

Maglio v. Jago, 580 F.2d 202, 203 (6th Cir. 1978), the United States Court of Appeals for the Sixth Circuit held the suspect's statement "Maybe I should have an attorney" was an assertion of the right to counsel. In United States v. Clark, 499 F.2d 802, 805 (4th Cir. 1974), the United States Court of Appeals for the Fourth Circuit held the suspect's statement "I had better talk to a lawyer" was a request for counsel. Using those federal precedents as guideposts, we determined in Messino that the suspect's statement was more in the nature of a request for advice than an ambiguous assertion of the right to counsel. We thus concluded Messino's question "[d]o you think I need a lawyer?" was not an assertion of the right to counsel and did not require the questioning to end. 378 N.J. Super. at 578.

As we have noted, the Supreme Court in Alston embraced the Messino rationale and cited to Maglio and Clark. In Alston, the defendant asked police, "should I not have a lawyer?" Our Supreme Court concluded that question was,

> in actuality, not an assertion of a right, ambiguous or otherwise. Rather, it was a question, posed to the investigating officer, that amounted to defendant's request for advice about what the detective thought that defendant should do. The response of the officer, which was entirely appropriate under the circumstances, was a simple request for clarification, in which he asked "[do y]ou want a lawyer?"
>
> [204 N.J. at 626 (alteration in original).]

The Court further explained,

> Although in responding to defendant's query about the mechanics of securing counsel, re-reading the portion of the <u>Miranda</u> warnings about the appointment of counsel might have been the more prudent course, on balance, we conclude that the detective's response was a fair recitation of the right to counsel and the right to have the interrogation cease. More to the point, because the detective was not obligated to give defendant advice about whether he should assert any of his rights, we cannot fault his choice of words as he sought to clarify defendant's requests while avoiding giving him the advice he was seeking.
>
> [<u>Id.</u> at 628.]

Importantly for purposes of the present case, the Court further remarked, "[t]he words the detective used in an effort to clarify whether defendant was attempting to assert any of his rights were neither inaccurate nor misleading." <u>Ibid.</u>

## B.

We next apply these foundational legal principles to the circumstances of the second stationhouse interrogation. Defendant's first reference to her right to counsel—"Do I need a lawyer"[9]—was, as in <u>Alston</u>, merely a request

---

[9] The CourtSmart transcript of the motion hearing suggests that defendant stated, "[c]an I maybe get a lawyer." <u>See</u> <u>supra</u> note 6. That statement, in our view, would constitute an unequivocal assertion of the right to counsel that would have required the immediate cessation of the nascent interrogation. But as we have noted, we rely on the transcript of the electronically-recorded

for advice and not an assertion of a right, ambiguous or otherwise. <u>Alston</u>, 204 N.J. at 626. The LTPD detective's response—"That's up to you. I can't give you legal advice if you want an attorney or not"—was entirely appropriate.

Defendant's second reference to the right to counsel and the CMCPO detective's ensuing response are very different. Defendant's declaration "That's why I feel I might need a lawyer" is substantially similar to the statement found to constitute an assertion of the right to counsel in <u>Maglio</u> ("Maybe I should have an attorney"). Construing this in the light most favorable to defendant, <u>Alston</u>, 204 N.J. at 621, we conclude that defendant's second reference was an invocation of her right to counsel.[10]

The CMCPO detective's initial response, "[w]ell, I mean that's a decision you need to make" was appropriate. Not so for the detective's following statement: "[b]ut if you didn't do anything, you certainly don't need to have, I mean that's—."

We infer from the context of the colloquy that the detective was telling defendant, essentially, that if she did not do anything wrong—e.g., provide

interrogation that was marked as Exhibit S-6 at the suppression hearing. <u>See</u> <u>supra</u> note 5.

[10] Applying the rationale of <u>Maglio</u> and <u>Clarke</u>, defendant's third reference to an attorney—"Yeah and that's why I feel like I need a lawyer"—constitutes a more definitive request for counsel.

CDS to the victim—then she did not need to have an attorney. Certainly, defendant interpreted the detective's remark as such when she immediately replied, "I didn't. I feel like I didn't do anything wrong."

Although the detective's transcribed sentence ends abruptly without explicitly repeating the word "attorney,"[11] it is clear from the context of the colloquy that the CMCPO detective was referring to defendant's need to have an attorney. The trial court did not make a factual finding that the CMCPO detective was referring to defendant's need to have something other than an attorney. Nor did the State argue—either before the trial court or on appeal— that the detective was referring to the need for something other than an attorney. Furthermore, on cross-examination at the suppression hearing, the LTPD detective not only confirmed his colleague was referring to the need for an attorney, but also admitted to making such statements to suspects as part of his own interrogation technique. The transcript of the suppression hearing reads:

> Defense       So at this time she's told that if she—she
> Counsel:       doesn't need a lawyer if she didn't do

---

[11] We note the transcript of the suppression hearing is significantly different. That version reads: "That's a decision you have to make. But if you didn't do anything wrong you certainly don't need to have one. I mean that's—." (emphasis added). The suppression hearing transcript version leaves no doubt the detective was referring to the need to have an attorney.

anything wrong, correct?

| | |
|---|---|
| LTPD Detective: | That's exactly what [the CMCPO detective] said, if she didn't do anything wrong she wouldn't need a lawyer. |
| Defense Counsel: | So it's—in your training and technique it's normal— |
| LTPD Detective: | Training and technique, yes, I've advised people before if they did nothing wrong then, yes, they would not need a lawyer. Yes, I've said that before.[12] |

The trial court reviewed the CMCPO detective's challenged comment and concluded, "it is unlikely that a reasonable person would consider the Detective's statement as an attempt to coerce a confession or a blatant disregard of a request for an attorney." Although we generally defer to a trial court's factual findings, as we have already noted, we need not defer to the trial court's interpretation of the legal consequences that flow from factual findings. Manalapan Realty, 140 N.J. at 378. Rather, we apply a de novo standard of review. Harris, 457 N.J. Super. at 43–44.

---

[12] We are troubled by the LTPD detective's testimony that he was trained to advise interrogees they do not need to speak to a lawyer if they have done nothing wrong. For the reasons stated in this opinion, we conclude such advice impermissibly undercuts the Miranda warnings and cannot be countenanced.

The legal test is not whether an interrogating officer "blatantly disregards" a request for counsel. Rather, the State bears the burden to show scrupulous compliance with <u>Miranda</u> and <u>Edwards</u>. <u>See</u> <u>State v. Hartley</u>, 103 N.J. 252, 260–61 (1986); <u>see also</u> <u>Bey</u>, 112 N.J. at 134 ("the State must prove admissibility beyond a reasonable doubt").

Nor does it matter whether the detective's offhand remark was "an attempt to coerce a confession." In determining whether <u>Miranda</u> rights were scrupulously honored, we do not examine whether an interrogating officer intended to undermine the <u>Miranda</u> warnings and coerce a confession, but rather whether the officer's words and actions complied with <u>Miranda</u>'s strict requirements. There is no "good faith" exception to <u>Miranda</u>. <u>See</u> <u>People v. Smith</u>, 37 Cal. Rptr. 2d 524, 525 (Cal. Ct. App. 1995) (declining "to extend the 'good faith' exception to the Fourth Amendment's exclusionary rule" recognized under California law "to salvage a confession obtained in violation of the Fifth Amendment"); <u>cf.</u> <u>State v. Novembrino</u>, 105 N.J. 95 (1987) (rejecting a "good faith" exception to the exclusionary rule under Article I, Paragraph 7 of the New Jersey Constitution, the state constitutional counterpart to the Fourth Amendment.). A <u>Miranda</u> violation triggers the exclusionary rule, whether intentional or inadvertent.

A-2485-19

In this instance, under the per se Miranda/Edwards rule as interpreted by the New Jersey Supreme Court in Alston, the CMCPO detective was required either to cease questioning or to pose only questions designed to clarify whether defendant was invoking her right to consult with an attorney. He was not authorized to offer advice. Although the CMCPO detective professed that he could not give legal advice or try to influence defendant's decision, he did in fact influence defendant by telling her, in practical effect, that innocent persons do not need the assistance of counsel at a stationhouse interrogation. That statement burdens the right to counsel because it could lead an interrogee to believe that police will infer guilt from a request for an attorney, thereby discouraging the assertion of the right.

In these circumstances, in sharp contrast to the situation in Alston, we are permitted—indeed, we are obliged—to "fault [the detective's] choice of words." 204 N.J. at 628. The proposition that interrogees who "didn't do anything [wrong]" have no need of a lawyer is by no means "a fair recitation of the right to counsel and the right to have the interrogation cease." Ibid. To the contrary, the suggestion that innocent suspects do not need to have an attorney runs diametrically counter to the letter and spirit of Miranda and was, without question, "inaccurate [and] misleading." Ibid.

23

In sum, far from clarifying an ambiguous request for counsel or deflecting a mere request for advice, the detective's response seriously undermined one of the essential protections embodied in the Miranda warnings, impermissibly burdening defendant's assertion of the right to counsel. See id. at 623. There is no doubt that Miranda would be violated if warnings administered at the outset of a custodial interrogation were altered to read, in pertinent part, "you have the right to the presence of an attorney, although you do not need one if you did nothing wrong." Here, the impact of the CMCPO detective's misstatement is no less significant merely because it was made spontaneously in the course of the interrogation. In this instance, the detective's inappropriate comment was offered as defendant struggled to decide if she should stop the interrogation and consult with counsel. At that critical moment, defendant was particularly vulnerable to external influence and strict and faithful adherence to Miranda principles was essential.

We recognize that both detectives stated repeatedly that it was for defendant alone to decide whether to exercise her right to counsel, and that they "[could] not influence [her]" election "one way or the other." Moreover, we acknowledge that we must consider the totality of the circumstances when reviewing an alleged Miranda violation. See Diaz-Bridges, 208 N.J. at 569. For the most part, the detectives' efforts to clarify defendant's references to her

right to counsel and deflect her request for legal advice were accurate and appropriate. However, that circumstance neither minimizes nor remediates the harm caused by the CMCPO detective's inaccurate and misleading remark.

Here, while the detective's improper remark was brief, its impact is self-evident—particularly when considering defendant's immediate response. The <u>Miranda</u> warnings are concise and compact. It takes only a few words to properly advise an interrogee of his or her right to counsel. Equally, only a few spontaneously uttered words can undermine and burden that right.

In this instance, the detective's ill-advised remark that an innocent person does not require assistance from counsel tacitly implied that a request to stop the interrogation to speak to an attorney would evince a consciousness of guilt. We reiterate that defendant's immediate response was to assert that she felt she had done nothing wrong. In sum, the detective's problematic statement—even when viewed in context with his other appropriate responses—impermissibly burdened the assertion of defendant's right to counsel and thus tainted her ensuing decision to proceed with the interrogation. <u>See</u> <u>Alston</u>, 204 N.J. at 623–24.

In view of our conclusion that the per se <u>Miranda</u> rule was violated during an early stage of the second stationhouse interrogation, thereby triggering the suppression remedy as to all admissions made thereafter, we

25

need not address defendant's alternate contention that her statement was involuntary considering the totality of the circumstances. See P.Z., 152 N.J. at 113.

IV.

For the foregoing reasons, we affirm the portion of the trial court's July 11, 2019 order denying defendant's motion to suppress her July 22, 2018 statement, and reverse the portion denying defendant's motion to suppress her statements made at the second interrogation. We remand to the trial court for proceedings consistent with this opinion.

Affirmed in part; reversed and remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2485-19